**Stanley M. GROSSMAN, Plaintiff,**

v.

**Edward M. JOHNSON, III, et al., Defendants.**

**Civ. A. No. 77–3015–T.**

United States District Court,
D. Massachusetts.

April 7, 1981.

Costello, Sullivan & Hammer, Avram G. Hammer, Boston, Mass., for plaintiff; Richard M. Meyer, Milberg, Weiss, Bershad & Specthrie, New York City, of counsel.

Allison, Clapp, Robert Johnson, McKenzie, Spaulding, Sumner H. Babcock and E. Susan Garsh, Bingham, Dana & Gould, Boston, Mass. and Hunton & Williams, Joseph C. Kearfott, Richmond, Va., for defendants.

Gaston Snow and Ely Bartlett, Peter M. Saparoff, Boston, Mass., for Fidelity Municipal Bond Fund, Inc.

Richard M. Reilly and James S. Dittmar, Berman, Dittmar & Engel, P. C., Boston, Mass., for Fidelity Management & Research Co., FMR Corp., Edward Johnson, Byrnes Loring.

## MEMORANDUM

TAURO, District Judge.

### I.

Plaintiff Stanley M. Grossman (Grossman) is a shareholder of Fidelity Municipal Bond Fund, Inc. (Fund).[1] The Fund is an investment company whose objective is to earn tax-exempt income for its shareholders by investing in municipal bonds. The Fidelity Management & Research Co. (FMR) is the Fund's investment adviser. At all

---

1. In constructing this statement of facts, this court assumes, as it must, that plaintiff's allegations are true.

times relevant here, several of the Fund's directors were also directors of FMR and other funds managed by FMR.

On September 30, 1977, Grossman brought this derivative suit against FMR, the Fund, and eight of the nine individual directors of the Fund, charging various breaches of fiduciary duty to the Fund and its shareholders. He did so without first demanding that the directors themselves bring suit on behalf of the Fund.

The complaint breaks down into two major allegations. First, Grossman contends that the Fund pays excessive compensation to FMR for its services as investment adviser.[2] Second, he contends that FMR has failed to recapture underwriting commissions[3] for the benefit of the Fund and instead has accepted research information from the underwriters. FMR then allegedly uses that research to advise other investment clients. This procedure, Grossman alleges, unjustly benefits FMR and its other clients at the Fund's expense. The gist of Grossman's theory is that the defendants' simultaneous association with the Fund, FMR, and with other investment companies results in two separate conflicts of interest. First, as directors of the Fund, their duty is to keep FMR's fees to a minimum. But, as directors of FMR they have an incentive to keep that company's earnings high by charging excessive advisory fees. Second, as Fund directors they have an obligation to recapture underwriting commissions to the greatest extent possible. As directors of

other funds, however, they face the temptation of accepting research information in lieu of cash, so that FMR can use that information in advising those other funds. This interlocking directorship triangle allegedly results in a breach of fiduciary duty to the Fund, in violation of Section 36(b) of the Investment Company Act.

Defendants moved to dismiss, on the grounds that (1) plaintiff had failed to make demand upon the directors to bring suit, as required by Fed.R.Civ.P. 23.1,[4] and (2) plaintiff did not fairly and adequately represent the interests of the shareholders.[5]

## II.

After a few procedural skirmishes not relevant here,[6] this court suggested that it might save everyone a great deal of time and litigation costs if plaintiff would actually make a demand on defendants, even though this lawsuit had already begun. The court theorized that, given an opportunity to consider such a demand, defendants just might respond favorably, or take other remedial action satisfactory to the plaintiff here. Plaintiff followed this suggestion, and on June 19, 1979 wrote a letter to the Fund's board of directors demanding that the Fund either bring suit or realign itself as a plaintiff in this action. The defendants, while maintaining their objections to the suit, agreed that the Fund should fully and fairly consider plaintiff's demand.

This court then stayed action on the dismissal motions for sixty days, and ordered

---

**2.** Throughout a period of substantial growth in the Fund's net assets, FMR's management fee allegedly has remained a fixed percentage of those assets. Hence, FMR's fee has greatly increased, even though the cost of performing its services has not. The result, according to Grossman, is that the Fund pays out about 10 percent of its income to FMR, while other municipal bond funds retain well-qualified advisers for as little as .15 percent.

**3.** See *Papilsky v. Berndt*, 76–77 CCH Fed.Sec.L. Rep. 95,267 (S.D.N.Y.1976).

**4.** Rule 23.1 provides, in relevant part:
In a derivative action brought by one or more shareholders to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to

enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege ... with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and ... the reasons for his failure to obtain the action or for not making the effort.

**5.** In view of this court's disposition of the other arguments raised by defendants in support of their motions to dismiss, it is unnecessary to decide the "inadequate representation" issue.

**6.** On February 5, 1979, this court allowed plaintiff to amend the complaint. Defendants then moved to dismiss the amended complaint.

the disinterested directors [7] (i. e. the Fund directors not affiliated with FMR) to review the demand and report back to the court. The disinterested directors delegated responsibility to a Special Committee made up of two non-defendant directors,[8] one of whom apparently joined the board after this litigation began. In turn, the Special Committee retained a law firm to investigate the merits of plaintiff's claims. The result was a 230-page report which concluded that the defendants had not violated the relevant statutory provisions, and which recommended that the Special Committee seek to dismiss the complaint. On December 18, 1979, the Special Committee voted to follow that recommendation.

Defendants now move to dismiss once again and, in the alternative, ask for summary judgment. In addition to their previous contentions, they argue that the board has made a good-faith determination that the derivative action should be terminated, and that, under the "business judgment" rule, this court must defer to the board's decision and dismiss the case.

### III.

#### A. *The Demand Requirement*

The source of the demand requirement in shareholder derivative suits is Fed.R.Civ.P. 23.1. In pertinent part, the Rule provides:

> The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority ..., and the reasons for his failure to obtain the action or for not making the effort.

The Rule "represents a deliberate departure from the relaxed policy of 'notice' pleading promoted elsewhere in the Federal Rules." *Heit v. Baird*, 567 F.2d 1157, 1160 (1st Cir. 1977). Simply stated, it places the burden on the shareholder "to demonstrate why the directors are incapable of doing their duty."

*In re Kauffman Mutual Fund Actions*, 479 F.2d 257, 263 (1st Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1963). The purpose of the demand requirement is "to require resort to the body legally charged with conduct of the company's affairs before licensing suit in the company's name by persons not so charged." *Heit v. Baird*, 567 F.2d 1157, 1162 n. 6 (1st Cir. 1977). Failure to comply results in dismissal of the complaint. *See, e. g., Lerman v. ITB Management Corp.*, 58 F.R.D. 153 (D.Mass.1973).

▪ As the language of the Rule implies, exceptional circumstances may make demand unnecessary. In general, the plaintiff must allege specific facts clearly demonstrating that the directors of the company would reject a demand if made. *See* 3B *Moore's Federal Practice.* ¶ 23.1.19, at 23.-1–83—.1–89 (2d ed. 1948); *Lerman v. ITB Management Corp.*, 58 F.R.D. 153, 156 (D.Mass.1973). In *In re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir. 1973), and *Heit v. Baird*, 567 F.2d 1157 (1st Cir. 1977), the First Circuit established guiding principles for measuring excuses for a failure to make demand. First, any allegations that directors affiliated with a management adviser "dominate and control" a fund's directorate must be supported by underlying facts. 479 F.2d at 264. Furthermore, mere resistance to the derivative suit by the fund's board of directors does not constitute a sufficient underlying fact. 567 F.2d at 1160. Second, "[t]he plaintiff must show not only that some directors were hostile to his suit because of their self-interest, but that a majority of the board at the time of suit were so implicated in the complained of facts as to make a demand for redress futile." *Id.* Finally, mere approval by directors of the alleged unlawful action does not constitute sufficient participation in that conduct to excuse demand upon them. *Id.*

---

7. The disinterested directors include Dwight L. Allison, Jr., Eugene H. Clapp, II, Robert L. Johnson, George K. McKenzie, and William R. Spaulding.

8. The two members of the Special Committee were Bertram H. Witham, a director since 1976, and David L. Yunich, who joined the board in 1978.

■ Grossman asserts that he made no demand because (1) the Fund's directors are controlled by FMR, and have knowingly participated and acquiesced in the supposedly unlawful conduct; (2) the directors "are operating under a disabling conflict of interest"; and (3) the directors have already stated their belief that the suit is without merit. Amended Complaint, ¶ 18. Under the standards adopted by the First Circuit, however, none of these assertions excuse plaintiff's failure to make demand.

The complaint advances no factual basis for his allegations that FMR "controls" the Fund. Indeed, it is undisputed that at the time of the complaint only three of the nine directors of the Fund were affiliated with FMR. The minority status of the affiliated directors hardly supports, and may well undermine, an inference of control by FMR. Plaintiff's bald assertion of "knowing participation" lacks the specificity necessary for a determination by this court as to whether the directors were "so implicated in the complained of facts as to make a demand for redress futile," as required by the First Circuit in *Heit*. Finally, Grossman's complaint of director "acquiescence" amounts to even less than an allegation of "approval", which the First Circuit rejected as insufficient in both *Heit* and *Kauffman*.

Plaintiff's "conflict of interest" allegations fare no better. The mere fact that some of the Fund's directors are also associated with FMR and with other investment companies does not, standing alone, demonstrate a conflict of interest that would excuse demand. At the time of the complaint, only one-third of the Fund's directors were also affiliated with FMR. A clear majority of Fund directors, however, would have no apparent conflicting interest that would impede their ability to weigh objectively a claim that FMR fees were "excessive."

On the other hand, it is true that Grossman's "failure to recapture" claim arguably implicates the entire board. FMR allegedly foregoes recapturing commissions that could enure to the Fund's benefit in order to obtain investment advice that is helpful to its management of other funds. As a consequence, plaintiff urges, the Fund directors, all of whom are directors of those other funds, have an incentive to prevent the recapture of those commissions. But plaintiff does not allege that FMR would be unable to obtain the same investment information, even if it implemented a policy of commission recapture. Nothing alleged demonstrates that FMR's destiny is so intertwined with its existing "no recapture" policy that it would be futile to demand a change, even from the interlocking directors. In other words, plaintiff's futility theory presumes motives and biases, even on the part of the interlocking directors, that simply are not warranted by the facts pleaded.[9]

■ Without merit as well is the argument that defendants' investigation and rejection of Grossman's claims after this suit was filed excuses a failure to have made such a demand prior to suit being brought.[10] Rule 23.1 is clear and unequivocal that, in derivative actions such as this, a shareholder demand must be made of appropriate corporate authorities *before* bringing suit, absent extraordinary circumstances that justify a failure to do so. A post-suit de-

9. It also appears that the legality of recapture by mutual funds is, at best, still in doubt. *See* FMR Defendants' Exhibit A (letter from Glen A. Payne, Special Counsel to the SEC's Division of Investment Management to John W. Belash); Securities Exchange Act of 1934 Release No. 17371 (Dec. 12, 1980); Securities Exchange Act of 1934 Release No. 17129, 45 Fed. Reg. 60529 (Sept. 8, 1980). Although primarily raising issues for disposition of plaintiff's · claims on the merits, this uncertainty also undermines plaintiff's contention that the Fund directors had a *duty* to recapture.

10. Contrary to plaintiff's assertions, this court did not instruct him to send a demand letter in order to eliminate the demand issue from the case. This court's purpose was to encourage plaintiff to give defendants an opportunity to review his grievances in the hope that expensive and lengthy litigation could be avoided. If nothing else, a *favorable* response to plaintiff's demand would have eliminated that issue from the case.

mand simply does not meet the Rule's procedural prerequisite. Plaintiff offers no authority for his *nunc pro tunc* theory, and this court was able to find none. Indeed, such an approach would effectively cripple the spirit and intent of the rule, which is to give corporate authorities an opportunity to deal with shareholder grievances prior to a derivative action being brought.[11]

Similarly without merit is plaintiff's further contention that the requirements of Rule 23.1 are not applicable to actions brought under section 36 of the Investment Company Act. This court rejected that argument once before in *Untermeyer v. Fidelity Daily Income Trust*, 79 F.R.D. 36, 44–46 (D.Mass.), *vacated on other grounds*, 580 F.2d 22 (1st Cir. 1978),[12] and it would be pointless to repeat in detail the analysis relied upon there. Suffice it to say that "unless the congressional intent [to supersede a Federal Rule] is clearly stated, a subsequently enacted statute should be so construed as to harmonize with the Federal Rules if that is at all feasible." 7 *Moore's Federal Practice* ¶ 86.05, at 86–22. Here, such a construction is more than feasible. Section 36 makes no mention of Rule 23.1, even though the drafters were obviously cognizant of other procedural issues.[13] If anything, its legislative history suggests congressional intent to retain the demand requirement.[14]

Moreover, other provisions of the Act place disinterested directors in a watchdog role over relations between funds and their advisers.[15] It would be incongruous to ascribe to Congress an intent to allow individual shareholders to sue on behalf of a corporation without first making demand upon those statutorily charged with such responsibility.[16] It makes more sense to presume that Congress intended that the disinterested directors at least have the opportunity to pass on the merit of a shareholder griev-

---

**11.** *Cf. Domaingue v. Butterworth*, 641 F.2d 8 (1st Cir. 1981), where the First Circuit adopted a similarly strict view toward satisfaction of procedural prerequisites. In *Domaingue*, the court found that a habeas corpus petitioner had failed to exhaust state remedies, even though it appeared that the petitioner had exhausted his appeal rights in between the time the petition was filed and the time the court decided the case:

> Our practice has been to determine the question of exhaustion as of the time a habeas corpus petition was filed, not as of the time the case is heard on appeal, and to require a new petition to be filed if state remedies are subsequently exhausted.

At 14.

**12.** In *Untermeyer*, the First Circuit vacated this court's judgment on the ground that demand is excused when half the board consists of "interested" directors. 580 F.2d at 24. The necessary premise of the First Circuit's holding, however, was that Rule 23.1 did in fact apply to a suit under section 36(b).

**13.** Among other provisions, the statute excuses plaintiff from proving personal misconduct on the part of any defendant; permits consideration by the court of ratification of compensation contracts by shareholders; and limits damages to "actual damages", recoverable only for the period one year prior to the initiation of the action. 15 U.S.C. § 80a–35(b)(1–3).

**14.** Congress was alert to the safeguards that would be afforded by the Federal Rules of Civil Procedure against frivolous suits under Section 36. For example, the Chairman of the SEC, responding to fears that the proposed legislation would open the door to unjustified strike suits, reported:

> We do not believe that this would leave the door wide open to nuisance actions. As we have pointed out previously, there are adequate safeguards under the Federal Rules of Civil Procedures [sic] and under this bill to prevent unjustified shareholder litigation.

*Hearings on H.R. 11995, S. 2224, H.R. 13754 and H.R. 14737, before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce*, 91st Cong., 1st Sess. 201 (1969).

The SEC Chairman also testified, "There are already in [the bill] and in the FRCP sufficient safeguards against frivolous or harassing lawsuits." *Id.* at 860.

**15.** Congress has insisted that a certain proportion of an investment fund board be disinterested, 15 U.S.C. §§ 80a–10(a), (d), and that these individuals review the contracts for fees to the investment advisers. *Id.* § 80a–15(c).

**16.** Plaintiff also analogizes section 36(b) to section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), which is exempt from the demand requirement of Rule 23.1. Section 16(b), however, is patently inapposite—unlike section 36(b), it contains its own demand requirement.

ance, before the fund became immersed in litigation.

### B. *The Business Judgment Rule*

The plaintiff's failure to comply with Rule 23.1 warrants dismissal of the complaint. But even if we assume that plaintiff's post-complaint demand constitutes compliance with Rule 23.1, the "business judgment" doctrine poses another obstacle to the continuation of this suit.

After plaintiff finally sent a demand letter in this action, a special committee of disinterested directors investigated his claims and concluded that prosecution of the suit was not in the best interests of the Fund and its shareholders. The issue then becomes whether this court, in a suit brought under section 36(b), must defer to the special committee's "business judgment" and, therefore, dismiss this action.

In *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), the Supreme Court considered precisely this issue with respect to other sections of the Act. Justice Brennan arrived at a two-step procedure for determining directors' termination rights:

> The threshold inquiry for a federal court [is] to determine whether state law permit[s] disinterested directors to terminate [the derivative] suit. If so, the next inquiry [is] whether such a state rule [is] consistent with the policy of the ICA.

*Id.* at 480, 99 S.Ct. at 1834.

■ In applying this method of inquiry to the present case, the first point of reference is the law of Maryland, the Fund's state of incorporation.[17] The Maryland Court of Appeals has firmly adopted the business judgment rule. In *Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24, 242 A.2d 512 (1968), *cert. denied*, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971), the plaintiff brought a derivative action against a milk cooperative and its directors, charging that a sale of certain property constituted waste of the coopera-

tive's assets. In considering plaintiff's claims, the court applied the business judgment rule:

> It is well established that courts generally will not interfere with the internal management of a corporation at the request of a minority stockholder or a member. The conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of the board properly exercises its business judgment, the directors are ordinarily not liable.... It is not the function of a court of equity to attempt to substitute its judgment ... *once it has been determined that their conduct is neither ultra vires, fraudulent, illegal nor grossly negligent.*

*Id.* at 540, 541. *Accord, Devereux v. Berger*, 264 Md. 20, 284 A.2d 605, 612 (1971).

The Maryland courts, however, have apparently not considered the application of the business judgment rule to termination of a derivative suit. It is appropriate, therefore, to consider decisions from other jurisdictions, in an effort to divine a majority trend which Maryland would likely follow. *See Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979).

■ Although the business judgment rule has not been unanimously extended to cover termination decisions, the "clear trend in corporate law", *id.* at 783, favors such an extension where the termination decision is made by a special committee of disinterested directors. *See, e. g., id.* (interpreting California law); *Abbey v. Control Data Corp.*, 603 F.2d 724, 729 (8th Cir. 1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980) (interpreting Delaware law); *Genzer v. Cunningham*, 498 F.Supp. 682, 686–89 (E.D.Mich.1980) (interpreting Michigan law); *Maldonado v. Flynn*, 485 F.Supp. 274, 278–79 (S.D.N.Y.1980) (interpreting Delaware law); *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 996 (N.Y.1979) (interpreting

---

17. *See, e. g., Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979); *Abbey v. Control Data*

*Corp.*, 603 F.2d 724, 728–29 (8th Cir. 1979).

New York law). *But see Maldonado v. Flynn*, 413 A.2d 1251, 1257 (Del.Ch.1980) (interpreting Delaware law), *dismissal contingently granted on res judicata grounds*, 417 A.2d 378 (Del.Ch.1980). This court concludes that Maryland courts would most likely follow this trend and permit a business judgment to terminate a suit and, therefore, holds that Maryland law permits disinterested directors, in the exercise of their business judgment, to terminate a derivative suit.

The second step in the *Burks* approach is to determine whether applicable state law is consistent with the policies behind the Investment Company Act. An appropriate starting point is the language of the Act. Section 36(b)(2) provides, in pertinent part:

> In any [action brought under section 36(b)] approval by the board of directors of such investment company of [payments to an investment adviser], or of contracts or other arrangements providing for such compensation or payments ... shall be given such consideration by the court as is deemed appropriate under all the circumstances.

15 U.S.C. § 80a–35(b)(2). Although the statute does not explicitly deal with decisions to terminate litigation, the term "approval" could be construed to encompass actions taken by a board to dismiss shareholder challenges. Under such a reading, the phrase "as is deemed appropriate under all the circumstances" would then call for some sort of case-by-case determination of whether the board's attempt to dismiss is proper.

Other sections of the Act reflect a somewhat different theme—the watchdog role of the disinterested directors. Under 15 U.S.C. § 80a–10(a), (d), a certain proportion of the board of an investment fund must be disinterested. Moreover, the disinterested directors must review the fees paid to investment advisers. *Id.* § 15(c). The legislative history of section 36(b) reemphasizes this federal policy of encouraging the unaffiliated directors to enforce management's fiduciary duty:

These provisions highlight the fact that the section is not designed to ignore concepts developed by the courts as to the authority and responsibility of directors. Indeed, this section is designed to strengthen the ability of the unaffiliated directors to deal with these matters and to provide a means by which the Federal courts can effectively enforce the federally-created fiduciary duty with respect to management compensation. The section is not intended to shift the responsibility for managing an investment company in the best interest of its shareholders from the directors of such company to the judiciary.

[1970] *U.S.Code Cong. & Ad.News* 4897, 4903 (reprinting S.Rep.No.91–184, 91st Cong., 2d Sess.).

The most recent analysis of federal policy comes from the *Burks* decision itself. In *Burks*, the Court recognized Congressional concern over the "potential for abuse inherent in the structure of investment companies," which are generally operated not by their own employees but by investment advisers. 441 U.S. at 480, 99 S.Ct. at 1834. But the Court also observed that the "cornerstone" of Congress's attack upon such abuse was the statutory requirement that at least 40 percent of the board of a mutual fund be made up of disinterested directors. *Id.* at 482, 99 S.Ct. at 1839. The Congressional design, therefore, was to entrust the independent directors with "the primary responsibility for looking after the interests of the funds' shareholders." *Id.* at 485, 99 S.Ct. at 1840. The Court concluded that, at least in some cases, federal policy would best be served by allowing the disinterested directors to exercise that responsibility and terminate a suit:

> Indeed, it would have been paradoxical for Congress to have been willing to rely largely upon "watchdogs" to protect shareholder interests and yet, where the "watchdogs" have done precisely that, require that they be totally muzzled.

*Id.*

The evidence thus gives rise to two separate inferences about federal policy. The

first is that Congress wished the judiciary to have some power to examine termination decisions on a case-by-case basis. The second inference, counterbalancing the first, is that Congress wished to place the primary responsibility for protecting corporate interests in the hands of the disinterested directors, not the courts. Each of the positions advocated by the parties rests on one inference at the expense of the other. Plaintiff urges that the business judgment rule should never bar derivative suits under section 36(b).[18] But that stance utterly ignores the role of the disinterested director as an independent check upon management. Defendants, on the other hand, argue for a straightforward application of the Maryland business judgment rule to termination decisions. While perhaps closer to the federal policy, this approach seems to undervalue the statutory command that board approval be given "such consideration by the court as is deemed appropriate under all the circumstances."

■ The best way to weave together these disparate strands of federal policy is to defer to the disinterested directors' business judgment, provided that the exercise of that judgment is reasonable under the circumstances.[19] Though roughly similar to the Maryland business judgment rule, which permits reversal of a fraudulent, illegal, or grossly negligent decision, a "reasonableness" inquiry includes some scrutiny of the investigation conducted by the special committee before reaching its conclusion. If the investigation is independent and has sufficient depth to provide a reasonable basis for the directors' decision to seek dismissal, then deference to that decision is appropriate. If not, then the decision can be given some weight, or none at all, depending on the level of investigation conducted. A rule of reasonableness allows for a case-by-case review of the special committee's decisions, without removing the primary burden of protecting corporate interests from the shoulders of the disinterested directors.

■ In short, federal policy requires a slightly stricter standard of review than that contained in the Maryland business judgment rule. Applying this reasonableness standard to the uncontroverted facts of this case, it is clear that the decision to terminate rested on a thorough and independent consideration of plaintiff's claims. It is undisputed that the special committee retained a law firm having no prior relationship with the Fund. That law firm undertook an investigation spanning several months, in the course of which it (1) reviewed minutes of board and committee meetings, selected financial information, and other documents and correspondence; (2) interviewed individuals active in the management of FMR, present and former Fund directors, auditors, representatives of other investment companies, representatives of government agencies, and counsel for the Fund and directors; and (3) carried out appropriate legal research. The result was a 230-page report fully analyzing the factual and legal issues raised by the demand letter, and finally concluding that plaintiff's claims lacked merit.

Plaintiff has given this court no reason to doubt either the independence or integrity of the Special Committee's investigation. This court, therefore, must uphold the Committee's decision to terminate the suit. Ac-

---

**18.** In support, plaintiff cites the following language from *Burks*: "And when Congress did intend to prevent board action from cutting off derivative suits, it said so expressly. Section 36(b) ... performs precisely this function for derivative suits charging breach of fiduciary duty with respect to adviser's fees." 441 U.S. at 484, 99 S.Ct. at 1840. This court does not regard the proffered language as being controlling for two reasons. In the first place, the power to terminate under section 36(b) was not at issue in *Burks* and therefore the quote is dictum. Moreover, as previously demonstrat-

ed, there are strong indicia of Congressional intent to allow termination under some circumstances.

**19.** At least one court has undertaken a similar, although somewhat more intrusive, inquiry in applying a standard business judgment rule. See *Rosengarten v. International Tel. & Tel. Corp.*, 466 F.Supp. 817, 822–28 (S.D.N.Y.1979). See generally Note, *The Business Judgment Rule In Derivative Suits Against Directors*, 65 Cornell L.Rev. 600, 614–15 (1980).

cordingly, defendants' motions for summary judgment are allowed.

An alternative order of judgment will issue.