Robert STROUGO, on Behalf of THE BRAZIL FUND, INC., Plaintiff,

v.

Juris PADEGS, Nicholas Bratt, Edgar R. Fiedler, Roberto Teixeira Da Costa, Ronaldo A. Da Frota Nogueira, Wilson Nolen, Edmond D. Villani, and Scudder, Stevens & Clark, Inc., Defendants,

and

The Brazil Fund, Inc., Nominal Defendant.

Robert STROUGO, on behalf of himself and all others similarly situated, Plaintiff,

v.

Juris PADEGS, Nicholas Bratt, Edgar R. Fiedler, Roberto Teixeira Da Costa, Ronaldo A. Da Frota Nogueira, Wilson Nolen, Edmond D. Villani, and Scudder, Stevens & Clark, Inc., Defendants.

No. 96 CIV. 2136 (RWS).

United States District Court, S.D. New York.

April 6, 1998.

Wechsler Harwood Halebian & Feffer, New York City, for Robert Strougo; Joel C. Feffer, Jeffrey M. Haber, of counsel.

Simpson Thacher & Bartlett, New York City, for The Brazil Fund Inc.; Michael J. Chepiga, Chet A. Kronenberg, of counsel.

Debevoise & Plimpton, New York City, for Scudder, Stevens & Clark, Inc., Juris Padegs, Nicholas Bratt and Edmond D. Villani; John S. Kiernan, Jeremy Feigelson, Edward V. Di Lello, of counsel.

Ropes & Gray, Boston, MA, for Independent Directors of The Brazil Fund; John D. Donovan, Jr., Richard S. Weitzel, of counsel.

*OPINION*

SWEET, District Judge.

Nominal Defendant The Brazil Fund, Inc. (the "Fund") has moved to dismiss the shareholder derivative complaint of plaintiff Robert Strougo ("Strougo") under Rule 12(b)(6), Fed.R.Civ.P., or, in the alternative, for summary judgment pursuant to Rule 56, Fed.R.Civ.P., based upon the determination of a special litigation committee of its Board of Directors (the "SLC") that the continued prosecution of this action is not in the best interests of the Fund and its shareholders.

For the reasons set forth below, the motions will be adjourned pending further discovery by Strougo.

**Prior Proceedings**

The background of this action has been set forth in the prior opinions of this Court, familiarity with which is assumed.

The procedural and factual background of this action is set forth in the prior opinions of the Court, familiarity with which is assumed. *See Strougo v. Padegs*, 986 F.Supp. 812 (S.D.N.Y.1997); *Strougo v. Padegs*, No. 96 Civ. 2136, 1997 WL 473566 (S.D.N.Y. Aug.18, 1997); *Strougo v. Padegs*, 964 F.Supp. 783 (S.D.N.Y.1997). Prior proceedings and facts relevant to this motion are set forth below.

Without making a prior demand on the Board, Strougo filed his initial complaint in this Court on March 22, 1996. He filed the first amended class action and verified shareholder derivative complaint (the "Complaint") on June 17, 1996, alleging improprieties arising out of a rights offering by the Fund on November 20, 1995 (the "Rights Offering").

The defendants Scudder, Stevens & Clark, Inc. ("Scudder") and the Directors of the Fund moved to dismiss the Complaint for, among other things, (I) failure to state a claim, and (ii) with respect to Strougo's derivative claims, failure to make a prior demand on the Fund's Board of Directors. By opinion and order dated May 6, 1997 (the "Order"), Strougo's direct class action claims alleging breach of fiduciary duty under section 36(a) of the Investment Company Act of 1940, as amended (the "ICA"), and under Maryland law, were dismissed as was the excessive compensation claim against Scudder and the directors who were employed by Scudder under ICA Section 36(b).

The motions to dismiss the derivative claims alleging breach of fiduciary duty under ICA Section 36(a) and Maryland law were denied except with respect to Roberto Teixeira da Costa ("Da Costa"), an outside director and a resident Brazilian director of the Fund, as was the motion by Scudder and the directors who were employed by Scudder to dismiss Strougo's ICA section 48(a) control person claim. Pre-suit demand on the Directors was excused because six of the Fund's seven directors were "interested" in the Rights Offering.

The defendants moved for reargument or, in the alternative, for certification of the order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) which motion was denied by opinion and order dated August 15, 1997. On September 10, 1997, the Fund moved to stay all proceedings for three months to permit the SLC to investigate the allegations of the lawsuit and to act in accordance with the findings of that investigation. The motion was granted by opinion and order dated December 1, 1997.

The instant motion under Rules 12(b)(6) and 56, Fed.R.Civ.P., to terminate and dismiss the action based upon the report of the SLC was heard and considered fully submitted on January 7, 1998.

**The Facts**

The Fund is a non-diversified, closed-end investment company registered under the ICA, and incorporated under the laws of Maryland. The fund invests almost exclusively in securities of Brazilian companies and commenced operations in 1988 with an issuance of common stock in an initial public offering. The Fund is managed by its investment advisor, Scudder. Scudder is paid a fee equal to a percentage of the Fund's average weekly net assets.

In October 1995, the Fund's Board of Directors raised additional capital—approximately $61 million—through the Rights Offering. The Rights Offering provided that each Fund shareholder would receive one right for each share held and that three

rights would entitle the holder to buy an additional Fund share at a discount to the current trading price of the stock. Shareholders who did not wish to exercise their rights could sell the rights on the New York Stock Exchange, where the rights were listed, or on the Chicago Stock Exchange. The prospectus for the Rights Offering (the "Prospectus") stated that its purpose was to raise new capital in order to take advantage of investment opportunities in Brazil without having to sell existing portfolio holdings thereby triggering capital gains. Strougo's complaint alleges, however, that "[t]hough purporting to raise money to take advantage of future investment opportunities in Brazilian securities, defendants' desire to conduct the Rights Offering was motivated by the desire to increase [Scudder's] fees." Complaint ¶ 79.

By resolutions dated May 28, 1997 (the "Resolutions"), following the resolution of certain of the matters described above, the Board of Directors of the Fund (I) created the SLC and delegated to that committee the powers of the Board to investigate Strougo's allegations and determine whether this litigation is in the Fund's best interests, and (ii) appointed Da Costa as a member of the SLC. Thereafter, Da Costa, pursuant to the Resolutions, nominated Kenneth C. Froewiss ("Froewiss") as a new member of the Board of Directors, and Da Costa appointed Froewiss as an additional member of the SLC.

Da Costa is the founder of the Comissao de Valores Mobiliarios, the Brazilian equivalent of the United States Securities and Exchange Commission. He served as its first president for three years and currently is the vice-chairman of Sul America, a Brazilian investment bank that is owned by the largest insurance company in Brazil of the same name and is also a member of the board of directors of several Brazilian companies. From 1988 through 1993, Da Costa served as a member of the Advisory Board of the Fund. In 1993, the Fund eliminated the Advisory Board. Shortly thereafter, Da Costa became a member of the Board of Directors. The record to date indicates that Da Costa has no business, personal or family ties with any of the other directors of the Fund.

The action against Da Costa, originally a defendant, was dismissed on the grounds that there was no basis to infer that Da Costa "would not act in the Fund's best interest." Order at 39.

Froewiss was elected to the Fund's Board over one year after the complaint was filed. Froewiss obtained a Ph.D. in economics from Harvard University in 1977 and thereafter he worked as an economist at the Federal Reserve Bank of San Francisco. Froewiss was employed at J.P. Morgan in New York as an economist in the treasury area and then from 1982 until 1984, worked at Goldman Sachs. In 1984, Froewiss returned to J.P. Morgan, first to run a research group and then to work as an investment banker specializing in insurance and mutual fund companies. In late 1996, Froewiss was appointed an adjunct professor at New York University's Stern School of Business and was named a visiting professor in September 1997.

The record to date indicates that Froewiss has no business, personal or family ties with any of the other directors of the Fund.

On July 10, 1997, the SLC retained Michael J. Chepiga and the law firm of Simpson Thacher & Bartlett as independent counsel to assist the SLC in its investigation. Chepiga is a litigator with extensive experience in securities and financial litigation and investigations. He was assisted by Gary Schpero, a corporate attorney and the head of the firm's investment fund practice group, and litigation associate Chet Kronenberg.

The SLC held its first organizational meeting on July 24, 1997. From July through November 1997, the SLC and its counsel interviewed eleven witnesses, and counsel reviewed over 30 boxes of documentary materials. Strougo and his counsel did not participate in the SLC's investigation, although invited.

The SLC interviewed the three Scudder Directors (Bratt, Padegs and Villani), the three Outside Directors (Fiedler, Nogueira and Nolen), three representatives of Scudder (Edmund Games, Judith Hannaway and John Hebble) and two representatives of Smith Barney (Beau Ogden and Michael Porter). Additionally, the SLC conducted follow-up

interviews of Bratt, Hannaway, Hebble and Padegs.

Each interview was attended and conducted by both SLC members (or, with respect to a few interviews, one SLC member) and their independent counsel. The SLC's counsel drafted a memorandum summarizing each interview, which was approved for completeness and accuracy by the SLC members. These interview memoranda were not shared with or given to anyone other than the SLC and its counsel. The interview memoranda are included in the Exhibits to the SLC's Report, which has been submitted on this motion.

In addition, the SLC's counsel and the SLC reviewed numerous newspaper and magazine articles from the United States financial press regarding rights offerings during the relevant time period.

On October 28, 1997, the SLC and its counsel reviewed the facts developed in the course of the SLC's investigation and the options available to the SLC. At the October 30, 1997 SLC meeting, the SLC determined that it had completed its investigation into the allegations of the Complaint, that the allegations had no merit and that termination of this lawsuit is in the best interests of the Fund and its shareholders and that pursuit of the Strougo litigation would be costly, distracting and would result in negative unjustified publicity for the Fund.

The SLC's factual findings and its conclusions set forth that the Rights Offering was motivated by the desire to take advantage of investment opportunities in Brazil and that Scudder and the Fund's directors believed that the decline in the Fund's stock price was attributable primarily to the so-called "tequila effect" following Mexico's devaluation of its currency in December 1994 and not to any underlying economic problems in Brazil. The SLC did not find any evidence that Scudder and the Scudder Directors proposed the Rights Offering to increase Scudder's fees or that the loyalty of the Outside Directors was to Scudder instead of to the Fund and its shareholders.

The Report states that the Fund's Board considered all of the various structural components of a rights offering (e.g., size/ratio of rights offering, transferable/non-transferable, fixed/variable pricing, over-subscription option, selling group) and approved, at Smith Barney's recommendation, the use of a selling group (i.e., an underwriting syndicate) for the Rights Offering which limited the effect of arbitrageurs on the Rights Offering. Scudder and the Fund's directors also made several efforts to ensure that foreign shareholders had the opportunity to participate in the Fund's Rights Offering. The Report found that Scudder and the Fund's directors considered (I) the fact that rights offerings are dilutive and generally have a near-term impact on market price; (ii) various issues with regard to the setting of the subscription price; and (iii) the anticipated expenses of the Rights Offering, including but not limited to the utility and expense of Smith Barney as lead underwriter and payments to selling group members.

The SLC also concluded that continuation of the lawsuit is not justified on the basis of any potential recovery from defendants for harm to the Fund since 92 percent of the Fund's shareholders subscribed in the Rights Offering and 61 percent oversubscribed, resulting in 2.7 million oversubscribed shares. In addition, the Report noted that while there was a near-term drop in the market price of the Fund's stock due to the infusion of new shares at a discount, the price rebounded in six weeks to the same price that the Fund's shares traded at before the Rights Offering was announced so that for every three shares that subscribing shareholders previously owned, they now owned the same three shares at the same price, plus a fourth share that they were able to purchase at a substantial discount. In addition, non-subscribing shareholders owned shares that had the same market value as before, plus any money earned from selling the rights attached to those shares. Finally, the Report noted that the Rights Offering benefitted shareholders because the Fund was able to take advantage of investment opportunities in Brazil without selling existing assets, which would have triggered taxes for shareholders. *See* Report at 41–46.

## Discussion

### A. The Delaware Standard Will Be Applied

 A committee of disinterested and independent directors of a corporation may move to terminate a pending shareholder derivative action which the committee determines in good faith to be contrary to the corporation's best interests. *See e.g., O'Donnell v. Sardegna,* 336 Md. 18, 26, 646 A.2d 398, 402 (Md.1994) (corporation, pursuant to the determination of its special litigation committee, moved for summary judgment in a derivative suit, "filing as exhibits the [special litigation committee] report and all of its underlying documentation"); *Rosengarten v. Buckley,* 613 F.Supp. 1493, 1499 (D.Md.1985) (concluding that "Maryland would follow the majority rule and permit an interested board of directors to appoint a special litigation committee of independent directors to review a pending derivative suit"); *Grossman v. Johnson,* 89 F.R.D. 656, 663 (D.Mass.1981), *aff'd,* 674 F.2d 115 (1st Cir.1982) ("Maryland law permits disinterested directors, in the exercise of their business judgment, to terminate a derivative suit"). The issue is one of state, not federal, law. In *Burks v. Lasker,* 441 U.S. 471, 480, 99 S.Ct. 1831, 1838, 60 L.Ed.2d 404 (1979), the Supreme Court held that federal courts must apply state law in determining the authority of independent directors to discontinue derivative suits. Because the Fund is a Maryland corporation, Maryland law controls. *See Grossman,* 89 F.R.D. at 662. The authority of the Fund's Board to appoint the SLC to review Strougo's claims and to determine what action the Fund should take was recognized in the December 1, 1997 opinion and order. *See Strougo,* 986 F.Supp. at 814.

The standard of judicial review of motions to dismiss derivative suits based upon the determination of a special litigation committee has never been addressed by a Maryland court. The question is thus presented whether to follow the standard announced in *Auerbach v. Bennett,* 47 N.Y.2d 619, 393 N.E.2d 994, 419 N.Y.S.2d 920 (N.Y.1979) (applying New York law), or the standard adopted in *Zapata* (applying Delaware law). Two federal court decisions—*Grossman* and *Rosengarten*—have split over whether Maryland courts would follow the *Auerbach* or *Zapata* standard to determinations by a special litigation committee to discontinue derivative suits.

In *Rosengarten,* The issue is described and resolved by the Honorable Herbert F. Murray as follows:

> The majority rule permits a committee of disinterested and independent directors to move to terminate a derivative action which the committee determines in good faith to be contrary to the corporation's best interests. The leading cases illustrating this principle are *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979) and *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.1981).

> \* \* \* \* \* \*

> Courts following the majority position have articulated slightly different standards for judicial review of motions to dismiss derivative suits. In *Auerbach,* the court held that the business judgment rule prevented judicial review of the merits of the committee's determination and limited judicial review to an analysis of the independence, good faith, and thoroughness of the committee's investigation. *Auerbach* placed the burden of proof on the plaintiff to show "facts sufficient to require a trial of any material issue of fact as to the adequacy or appropriateness of the *modus operandi* of [the] committee." Some courts have followed *Auerbach,* including the *Grossman* court applying Maryland law. *See Grossman v. Johnson,* 89 F.R.D. 656 (D.Mass. 1981) (applying Maryland law in an alternative holding); *Gaines v. Haughton,* 645 F.2d 761 (9th Cir.1981); *Genzer v. Cunningham,* 498 F.Supp. 682 (E.D.Mich. 1980).

> *Zapata,* a decision by the Delaware Supreme Court, took the *Auerbach* test one step further and, in addition, placed the burden of proof on the corporation. The first step of the *Zapata* test is identical to the *Auerbach* test except for the shift in burden of proof. 430 A.2d at 788. If the court determines that the committee is independent, acted in good faith, and had

reasonable bases for its conclusion, then *Zapata* requires the court to proceed with a second step. It must then determine whether the motion should be granted. 430 A.2d at 789. Several courts have applied the *Zapata* test. *See Joy v. North*, 692 F.2d 880, 891 (2d Cir.1982); *Abella v. Universal Leaf Tobacco Co.*, 546 F.Supp. 795, 799–800 (E.D.Va.1982) (applying Virginia law); *Watts v. Des Moines Register & Tribune*, 525 F.Supp. 1311, 1326 (S.D.Iowa 1981).

\* \* \* \* \* \*

Next, the court must consider whether to limit its inquiry to the Committee's independence and good faith in accordance with the *Auerbach* decision or to also apply its own business judgment to the Committee's conclusions as the Delaware court did in *Zapata*. In this connection, the court notes that one federal court already has concluded Maryland would apply the *Auerbach* rule. *See Grossman v. Johnson*, 89 F.R.D. 656, 664 (D.Mass.1981). The *Grossman* decision predates *Zapata*, however, so it is not particularly instructive. The more recent cases the court has examined reveal a preference for the *Zapata* test. *See, e.g. Hasan v. Clevetrust Realty Investors*, 729 F.2d 372, 379–80 (6th Cir. 1984) (court discusses both *Auerbach* and *Zapata* tests; appears to prefer *Zapata*); *Joy v. North*, 692 F.2d 880, 891 (2d Cir. 1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983) ("The function of judicial scrutiny of a committee's recommendation is to determine independently whether the action is likely to harm the corporation rather than help it."); *Abella v. Universal Leaf Tobacco Co.*, 546 F.Supp. 795, 799 (E.D.Va.1982) (court finds reasoning in *Zapata* persuasive). These courts have concluded that the *Zapata* approach better balances the competing interests of the minority shareholder and the board. Judge Merhige commented as follows:

the Delaware Supreme Court showed its sensitivity to the danger of giving minority shareholders the power to embroil the corporation in ill-founded litigation pursuant to the minority rule, as well as the danger of allowing the board of directors to appoint a few "good ol' boys" as a special litigation committee and to be accordingly whitewashed pursuant to the majority rule. While the Court recognizes the limitations of its own expertise in applying its business judgment to the decision as to dismissal, it also recognizes the relative ease with which a committee could construct a record of apparently diligent investigation after having predetermined the outcome of the investigation. The Court is persuaded that the *Zapata* approach adequately safeguards the competing interests at stake.

*Abella*, 546 F.Supp. at 799.

The court notes that a number of commentators have found fault with the *Auerbach* approach because it does not acknowledge the structural bias inherent in a system which allows directors to judge the actions of their fellow directors. *See, e.g.* Brudney, V.. The Independent Director: Heavenly City of Potemkin Village, 95 Harv. L.Rev. 597 (1982); G.W. Dent, Jr., The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit?, 75 Nw. U.L.Rev. 96 (1980). The court agrees with these commentators and with the courts that have followed *Zapata*. Accordingly, the court finds that Maryland would be likely to apply the *Zapata* test to the instant case.

Our Circuit, in *Joy v. North*, 692 F.2d 880 (2d Cir.1982), concluded in the absence of any state authority that in a similar situation, Connecticut would apply the *Zapata* standard rather than the *Auerbach* standard. That conclusion certainly buttresses the conclusion of the Maryland District Court that Maryland would also apply the Delaware *Zapata* rule. The *Rosengarten* conclusion and the *Zapata* standard will be followed in this action.

■ Therefore the Fund has the burden to establish that the SLC was independent, that the investigation was conducted in good faith and that the SLC had a reasonable basis for its conclusion. In addition the Report must satisfy the business judgment of the Court.

### B. *Further Discovery is Appropriate*

The Fund has recognized that factual issues are presented by the *Zapata* standard and indeed Strougo has pressed his demand for further discovery under Rule 56(f),[1] pointing out that no deposition or document discovery has been had, his counsel having rejected the offer to take depositions without inspecting the underlying documents.

Strougo has noted some prior exercises by this Court of Rule 56(f) in *Elliott Assocs., L.P. v. The Republic of Peru,* 961 F.Supp. 83, 86 (S.D.N.Y.1997) ("It is the duty of this court under rule 56(f) to ensure that the parties have been given a reasonable opportunity to make their record complete before ruling on a motion for summary judgment.")

While it appears that the Fund has met its *prima facie* burden of proof with respect to the *Zapata* standard, Strougo has not had an opportunity to discover with respect to the elements of that standard. Therefore, Strougo may (1) inspect the thirty boxes and any other documents made available to the SLC, (2) inspect the notes of interviews and drafts of the Report; and (3) depose the members of the SLC.

### *Conclusion*

Despite the more than deliberate pace of this action, to which the Court has regrettably contributed, it is hoped that all preliminary matters can be concluded before the three year anniversary of the Rights Offering at issue. To that end the discovery provided here will be completed within sixty (60) days and this motion renewed on July 29, 1998, unless counsel agree otherwise.

It is so ordered.

---

1. Rule 56(f) provides that "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."