Kent BACH, Plaintiff-Appellant,

v.

NATIONAL WESTERN LIFE INSURANCE CO., et al., Defendants-Appellees.

No. 86–1290.

United States Court of Appeals, Fifth Circuit.

Feb. 23, 1987.

---

James V. Sylvester, Donald Scott Thomas, Jr., Clark, Thomas, Winters & Newton, Austin, Tex., for Bach.

Shannon H. Ratliff, Jerry A. Bell, Jr., McGinnis, Lochridge & Kilgore, Austin, Tex., for Moody.

R. James George, Jr., David Cohen, Graves, Dougherty, Hearon & Moody, Austin, Tex., for Shadek, Pauls, Dunn, Edwards, Sheppard & McLeon.

Will D. Davis, Heath, Davis & McCalla, Austin, Tex., Henry S. Nygaard, Craig T. Vincent, Salt Lake City, Utah, for Nat. Western Life Ins. Co.

Before VAN GRAAFEILAND *, HIGGINBOTHAM, and JONES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Applying Colorado law, we review a summary judgment for defendants granted in a shareholder's derivative suit after a special litigation committee of the board concluded that prosecuting the suit was not in the interest of the corporation. We affirm, concluding that Colorado's adoption of an expansive business judgment rule signals a favorable view of its application to the decisions of an SLC, and that there was no genuine issue of material fact regarding the good faith, independence, or thoroughness of the SLC.

I

National Western Life Insurance Company is incorporated under the laws of the State of Colorado. While publicly held, Robert L. Moody of Texas owns 37% of NWL's class A common stock and 99% of its class B common stock. Moody and John R. Howard, an officer of NWL, managed its investment program and in June 1977 began to purchase substantial amounts of securities issued by the Government National Mortgage Association and the Federal Home Loan Board. Moody ran this investment program from his house in Galveston, Texas, without approval of NWL's investment committee and apparently without the directors' knowledge. They purchased "ginney-maes" and "freddy-macs" on margin, borrowing approximately 95% of their purchase price. The purchases were bets that short-term interest rates would remain lower than long-term interest rates. With the leverage of high margin purchases, potential profits were substan-

* Circuit Judge of the Second Circuit, sitting by designation.

tial; so were potential losses. At the outset, the investments were profitable, and Moody, assisted by Howard, continued to purchase. By April 30, 1979, NWL's position had expanded to at least $97,000,000.00, with commitments to purchase an additional $56,000,000.00 of securities.

Contrary to the prediction of financial pundits, and Moody's gamble, by April 1979 short-term interest rates exceeded long-term rates and moved to even higher levels by the end of the year. NWL's relationship with its bond broker compounded the difficulties of the market's turn. Moody had steered all the purchases of government bonds through Hibbard & O'Conner Government Securities, Inc., "HOGS", a small Houston bond house, which turned out to be in financial trouble. HOGS had pledged NWL's securities to others under repurchase agreements and converted to its own use $3,500,000.00 of NWL's money.

Faced with a substantial loss, NWL made substantial capital investments in the brokerage house, and entered into a reinsurance agreement with a consortium led by Beneficial Life Insurance Company, exchanging approximately $28,000,000.00 of NWL insurance business. Ultimately, NWL sustained a loss of approximately $35,000,000.00.

The agreement between NWL and the consortium restricted the activity of Moody and gave the consortium two seats on the board; by August 1980 they were filled by Arthur O. Dummer of Beneficial and Gerald Levy of North American Reassurance Company. Shortly before Levy and Dummer became directors, Kent Bach, a stockholder, sent to the NWL Board a demand that NWL sue to recover the losses suffered in its investment in government bonds. The board of directors refused the demand, and Bach filed this suit. The board then appointed Dummer and Levy to a special litigation committee, which after an extensive investigation extending over a nine-month period, found that pursuing the suit would not be in the interest of the company. The district court granted summary judgment for the defendants, concluding that the SLC was independent and that its decision was an exercise of business judgment that Colorado courts would not review. This appeal followed.

## II

Bach argues here that the district court erred in predicting that Colorado's courts would adopt the deferential standard for judicial review of decisions by special litigation committees set forth in *Auerbach v. Bennett,* 47 N.Y.2d 619, 393 N.E.2d 994, 419 N.Y.S.2d 920 (1979), instead of the more intrusive review reflected by the Delaware decision of *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.1981). Under *Zapata,* he argues, there is no bar to judicial review of the merits of the SLC decision when that decision is not sustained as an exercise of reasonable business judgment.

NWL argues that the district court should be affirmed because Bach failed to controvert its summary judgment evidence, because Colorado law limits judicial inquiry to the independence of the committee and does not permit judicial review of the merits of a SLC's decision, because it was appropriate for the district court to resolve any disputed issues of law, and because there were no fact questions regarding the independence of the committee. Finally, NWL argues, that in any event, the committee's decision was meritorious.

## III

*Auerbach* and *Zapata* are said by the parties, with support from the extensive commentary on the role of special litigation committees in shareholder derivative actions, to represent the two leading views. In *Auerbach* the New York Court of Appeals limited judicial review to the good faith, independence, and thoroughness of an SLC. In *Zapata,* the Delaware Supreme Court went further to provide a second inquiry when the shareholder demand is excused. If demand is excused, the court may choose as a matter of its discretion to apply its own business judg-

ment to the merits of the committee's decision.

In this case the thoroughness of the work done by the SLC is not at issue. The concepts of good faith and independence tend to overlap at the margins; but apart from this overlap, where bad faith might be inferred from a lack of independence, the good faith of the SLC is not disputed. In short, under the first step of either of the competing tests, we have only the question of committee independence.[1] Because predicting Colorado's choice between *Zapata* and *Auerbach* is at best an informed guess and not binding on that court, as a matter of prudence, we ought not make the guess unless our decision requires it. Of course, *Zapata's* second step will not be relevant, and hence the choice between *Zapata* and *Auerbach* will be unnecessary, unless this is a demand-excused case. How Colorado would answer that question appears to be the more easily answered question. For that reason, we will first examine the issue of director independence and then turn to the question of whether the Colorado courts would excuse demand in this case.

### IV

■ Bach argues that there were, at the least, questions of fact regarding the independence of the members of the special litigation committee. He points out that both of its members were executives of other insurance companies "who had taken their positions on the Board pursuant to the terms of reinsurance agreements between NWL and a group of companies." However, Bach failed to explain how the members' ties to the other companies were disqualifying. Bach suggests that the reinsuring companies tended to benefit "from NWL's misfortune by assuming a portion of NWL's risks and profits." This sharing of risks, however, made parallel their interest and the interest of NWL, only assuring

that the committee members acted in the interest of the corporation. Moreover, the investment of the reinsuring companies had been fully recaptured when the committee launched its investigation.

■ Bach argues that the absence of independence of the SLC members is demonstrated by their voting in September 1980, before their investigation, for a resolution authorizing reimbursement of directors' interim litigation expenses. The suggestion is that authorizing this payment compromised the SLC's duty to decide independently whether prosecution of the suit was in the interest of the corporation. However, NWL by-laws provided such protection to directors. Under Colorado law, directors are liable only for "clear and gross negligence." *Dunbar v. Finegold,* 501 P.2d 144, 146 (Colo.App.1972). The implementing resolution made no judgment regarding director culpability, nor did it authorize indemnification under circumstances where the SLC might otherwise wish to pursue the suit, such as a conclusion by the committee that the defendants had been grossly negligent. That is, the directors were otherwise indemnified from their acts of ordinary negligence and not from any acts of gross negligence. The suit would not be pursued except in the latter case, and the committee's assertedly premature vote created no incentive not to pursue the suit.

Bach next argues that committee independence was compromised by its early meeting at a resort with Moody's counsel and other directors. No specific occurrences at this meeting are cited and the argument rests, by necessity, on a perceived socialization of the SLC. While such a concern does drive the *Zapata* view, accepting structural bias as an absolute determinant of interest is a rejection of a role for the SLC in derivative suits. Nothing suggests that Colorado would go so far.

---

1. The difference between *Auerbach* and the first step of *Zapata* is that *Zapata* places upon the corporation "the burden of proving independence, good faith, and reasonable investigation."

*Zapata,* 430 A.2d at 788. However, placement of the burden of proof does not matter in this case because wherever the burden is placed, there are no issues of material fact.

We are persuaded that there is no fact question regarding the independence of the committee, its good faith and thoroughness of investigation. Thus, we conclude that under *Auerbach* the district court properly granted defendants' motion for summary judgment. We turn now to the question of whether this is a demand-excused case and, if so, whether we should proceed to step two of *Zapata*.

## V

█ The first difficulty with Bach's argument that demand is excused is that he made a demand and it was refused. Colorado could follow Delaware and choose a relatively mechanical view, treating the making of a demand as a waiver of any contention that demand was excused. In *Stotland v. GAF Corp.*, 469 A.2d 421, 422 (Del.1983), the Delaware Supreme Court held that by making a demand the plaintiff "mooted" his claim that demand was futile. In *Abbey v. Computer & Communications Technology Corp.*, 457 A.2d 368, 374 (Del.Ch.1983), that court held that by appointing an SLC, the board conceded it could not act as an independent body in reviewing shareholder demands.

The incentives of the Delaware rule are apparent: it discourages the making of demands and the delegation of investigative duties to the most independent directors. In this sense, the Delaware rule is hostile to business judgment and is an unlikely candidate for adoption by jurisdictions in which business judgment is more warmly embraced. *See Joy v. North*, 692 F.2d 880, 888 n. 7 (2d Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). In our view, Colorado is such a jurisdiction, and we are persuaded that it would not subscribe to a theory of waiver.

Colorado courts have expressed reluctance to intrude into the internal affairs of Colorado corporations. In *Horst v. Traudt*, 43 Colo. 445, 96 P. 259 (1908), the court said: "The courts will not, as a general rule, at the suit of a stockholder, or any number of stockholders, interfere with the internal affairs and management of a corporation." *See also Rywalt v. Writer Corp.*, 34 Colo.App. 334, 526 P.2d 316 (1974). Colorado limits the liability of directors to "clear and gross negligence." *See Dunbar v. Finegold*, 501 P.2d 144, 146 (Colo.App.1972). In sum, Colorado law reflects considerable deference to business judgment, a policy choice informing our task.

The Delaware court's *Zapata* decision contemplates a greater judicial role in reviewing the work of a SLC than New York's *Auerbach* decision, at least when demand is excused. Its later decision in *Aronson v. Lewis*, 473 A.2d 805 (Del.1984), however, seems to curtail the possibilities of excusing demand and in doing so reduces the number of cases in which the distinction between *Auerbach* and *Zapata* will be of consequence. The *Aronson* court explained:

Our view is that in determining demand futility the Court of Chancery in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

*Id.* at 814.

Some able commentators have observed that by insisting upon demand in more cases *Aronson* takes back much of what *Zapata* gave. *See* Block & Prussin, *Termination of Derivative Suits Against Directors on Business Judgment Grounds: From* Zapata *to* Aronson, 39 Bus.Law. 1503 (1984); that distinctions between *Auerbach* and *Zapata* may be blurring in critical areas. Perhaps so, but our decision does not require us to join this rich debate about a developing area of the law, a debate that now engages the American Law Institute, and we prefer to rest upon the most secure terrain possible.

We do not pretend to be certain how Colorado might refine its rules regarding futility of demand, but we are persuaded that, given its deference to business

judgment, Colorado would follow the Second Circuit. Before *Aronson*, both the Second Circuit and Delaware courts had held that allegations that a majority of the board approved of or acquiesced in the accused events would not alone excuse demand, *see Lewis v. Graves*, 701 F.2d 245, 248–49 (2d Cir.1983); *Haber v. Bell*, 465 A.2d 353, 359 (Del.Ch.1983), nor would the naming of all directors as defendants. That circuit also refuses to excuse demand in the absence of particularized allegation "of self-dealing or bias on the part of a majority of the board." *Lewis*, 701 F.2d at 248. Under this standard this was not a demand-excused case, and we need not rest on our best guess of how Colorado courts would further choose between the *Auerbach* and *Zapata* lines of cases or how they might otherwise weave from their distinct strands. Rather, we stop here, certain at least that the Colorado Supreme Court would affirm the district court.

AFFIRMED.