**John C. JOHNSON, Jr., Plaintiff,**

**v.**

**Steven L.W. HUI, et al., Defendants.**

**No. C–90–1863 DLJ.**

United States District Court, N.D. California.

Sept. 5, 1991.

**480**

Alan M. Mansfield, Milberg, Weiss, Ber-shad, Specthrie & Lerach, San Diego, CA, for plaintiff.

Norman J. Blears, Heller, Ehrman, White & McAuliffe, Palo Alto, CA, for defendants.

## ORDER

JENSEN, District Judge.

This motion came on for hearing on August 14, 1991. Norman Blears appeared for nominal defendant Everex Systems, Inc. Alan Mansfield appeared on behalf of plaintiff John C. Johnson, Jr. For the reasons described below, nominal defendant Everex System, Inc.'s motion to terminate

further litigation of plaintiff Johnson's shareholder derivative claim is GRANTED.

## I. BACKGROUND.

This motion arises in the context of a securities fraud suit initiated by plaintiff John C. Johnson ("Johnson") on behalf of himself and derivatively on behalf of Everex Systems, Inc. ("Everex"). Everex is a company which manufactures personal computers and computer peripherals. Everex is incorporated in Delaware and maintains its principle place of business in Fremont, California. In simplest terms, Johnson alleges here that certain large investors in Everex, along with Everex's officers and directors manipulated press releases and public disclosures to insure that they would be able to sell Everex stock at inflated prices. Everex, appearing as a nominal defendant, now moves to terminate this litigation to the extent that Johnson proceeds on behalf of Everex under Federal Rule of Civil Procedure [1] 23.1, Derivative Actions by Shareholders. The relevant facts can be summarized as follows.

### A. The Defendants.

We begin with a review of the many defendants named in this action. The named defendants who are officers and/or directors of Everex include:

Steven Hui ("Hui"), the President and Chief Executive officer of Everex from its founding in 1983 to January 1991;

John Lee ("Lee"), a co-founder, Vice President and director of Everex;

Raymond Yu ("Yu"), Everex's Vice President of Engineering from 1986 through March of 1991;

Robert Teal ("Teal"), a director of Everex since 1987;

Gregory Avis ("Avis"), a director of Everex from October of 1986 through November of 1990;

Michael Wong ("Wong"), a director since 1983, and Chairman of the Board from October, 1985 through January, 1991;

Michael Everitt ("Everitt"), a director from 1986 through June of 1989;

Gabriel Chan ("Chan"), Chan became a director in June of 1989 when Everitt resigned.

In addition to these director and officer defendants, Johnson has also named Gatcombe Corporation ("Gatcombe") and Aciest Company, Ltd. ("Aciest"). Gatcombe and Aciest are affiliates of Wong's Industrial (Holdings) Ltd., ("Wong's Holdings"). Wong's Holdings is a Hong Kong corporation controlled by the Wong family. Defendants Wong and Everitt are members of the Wong family, and Chan is an executive of Wong's Holdings. Through Gatcombe and Aciest, Wong's Holdings has been Everex's largest shareholder, and still retains over 20% of Everex's outstanding stock.

### B. The Misconduct Alleged In The Complaint.

It is undisputed that between March 9 and October 3 of 1989 the defendants collectively sold over two million shares of Everex stock. Plaintiff Johnson alleges that these stock sales were made in violation of defendants' fiduciary duty to Everex and other Everex shareholders. In particular, plaintiff alleges that during this period defendants had insider knowledge that Everex stock was overvalued by the market. According to plaintiff, this knowledge took two forms.

First, plaintiff alleges that each of the defendants was aware that competitive pressures in the market for personal computers and computer peripherals were pushing down Everex's revenues and profitability. For example, in paragraph 15 of the complaint,[2] Johnson alleges:

In 1988, there was a severe semiconductor shortage. This resulted in greater [Static and Dynamic Random Access Memory Chip] prices, and, consequently, lower profit margins for personal computer manufacturers. Everex's earnings per share fell [as a result....]

1. Hereinafter, the "Rules" or the "Rule."

2. All references to the "complaint" refer to plaintiff's Verified Derivative Complaint for Violations of Fiduciary Duties and Damages, filed on July 2, 1990.

By early 1989, it was apparent that semiconductor supplies had rebounded and that [memory chip] prices would decrease. However, market entry and technological innovation continued to place downward pressure on personal computer prices. As a result of this competitive environment, market participants transferred their lower costs, realized from improvement in the semiconductor market, into lower personal computer prices.

Consequently, Everex's record revenue growth began to decline. The Company's quarter-to-quarter revenue growth averaged only 5.5 percent per quarter in 1989 compared to nearly 13 percent per quarter growth realized in 1988. Complaint at 7–8, ¶ 16 (paragraphing added).

In addition to each defendant's alleged knowledge of the effect of these market pressures on Everex, Johnson alleges that defendants also encouraged false market optimism by causing Everex to issue a series of press releases which did not warn of decreasing profits and heralded continued increases in revenues and profits. Six press releases are identified specifically in plaintiff's complaint, and these releases fall into two categories.

First, on March 2, May 23, and September 6 of 1989 Everex issued press releases summarizing and commenting upon Everex's financial results as described in quarterly financial reports. These quarterly financial reports were prepared and released just one or two days before the March 2, May 23, and September 6 press releases. All three releases in this group describe substantial growth over the parallel quarter from the previous year. In particular, these releases highlight "continued rapid revenue growth and improving gross [profit] margins" based on "a decrease in some component costs, manufacturing efficiencies and better absorption of overhead costs, and an increase in the sale of higher margin products such as our ... personal

computers." May 23, 1989 Release, Report[3] at Exh. 4, p. 1.

Second on April 10, August 2, August 14 of 1989, and in a portion of the above referenced May 23 release, Everex announced various new products and new deals. On April 10 Everex announced that it had begun shipping its newest computer model, the STEP 386/33. On May 23 Everex announced a cross-licensing agreement with IBM. On August 2, Everex announced the release of its own version of the Microsoft OS/2 operating software which enhanced the performance of Everex's STEP computers. And on August 14 Everex allegedly announced that it had been awarded a contract to supply its computers to the United States Postal Service.

In sum, the complaint alleges that the defendants collectively sold over two million shares of stock at a time when they knew, or should have known, that the market price of the stock was inflated by press releases which optimistically heralded continued growth while failing to inform investors that Everex's revenue and profits were in fact being reduced by competitive pressures in the computer marketplace.

### C. The Report Of The Special Litigation Committee.

■ It is undisputed that Delaware law provides Everex with certain prerogatives in a derivative suit brought on behalf of Everex by a shareholder. Most relevant here, Delaware law endows Everex with the power to form a special litigation committee (SLC) of the board of directors, and to either terminate or assume prosecution of the suit based upon the SLC's review and recommendation. 8 Del.Code §§ 141(a) & (c); *Zapata Corporation v. Maldonado*, 430 A.2d 779 (Del.1981).

On November 19, 1990, the Board of Directors of Everex created a SLC, and appointed defendant Robert Teal as its then sole member. Teal's first steps were to fill out the staff of the SLC. In December of 1990, Teal hired the law firm of

---

**3.** All citations to "Report" refer to the Report of the Special Committee of the Board of Directors of Everex Systems, Inc., Dated April 15, 1991.

Morrison & Foerster as SLC counsel (hereinafter, "committee counsel"). On February 13, 1991, Teal also oversaw the appointment to the SLC of Robert Louthan ("Louthan").

Following its formation, the SLC initiated its investigation of the merits of plaintiff Johnson's derivative suit, and the desirability of its continued prosecution. Much of the investigation was conducted through committee counsel. Committee counsel initially circulated document requests throughout Everex. The specific terms of counsel's document requests do not appear in the record. Committee counsel also reviewed the reports of outside securities analysts issued during the period of the insider stock sales alleged by Johnson. It is also clear from the record that counsel examined certain publicly available documents, including Securities and Exchange Commission filings by Everex and many of the individual defendants. The final report of the SLC states that in all, committee counsel reviewed roughly 4500 pages of documents.

In addition to its review of the documentary record, committee counsel also interviewed ten witnesses. A full list of these witnesses is set out in the notes, and includes five defendants, four non-defendant Everex managers, and one outside financial analyst.[4]

The SLC supplemented the investigation of committee counsel with its own investigation. On March 25, April 1, April 8, and April 15 of 1991, the SLC met with committee counsel to review the progress of counsel's investigation, to provide guidance to committee counsel, and, at the April 1 meeting, to interview witnesses. On April 1, the SLC interviewed defendants Hui, Lee, and Avis, as well as one of Everex's outside auditors, Mark Pickup, a partner of Ernst & Young.

On April 15, 1991, the SLC met and approved its final Report of the Special Com-

mittee of the Board of Directors of Everex Systems, Inc., (the "Report"). The Report details the analysis and conclusions of the SLC in some detail. These details will not be repeated here, although the Court has assumed some familiarity with the Report in drafting the terms of this Order. Suffice it to say that the SLC found that the evidence did not support Johnson's allegations, and that further prosecution of Johnson's suit did not serve the interests of Everex.

### D. The Present Motion To Terminate.

On May 17, 1991, Everex filed the present motion to terminate the litigation based upon the recommendation of the SLC. In its Orders of June 12 and June 28, 1991, the Court allowed plaintiff Johnson to take discovery into the nature the SLC, the scope of its investigation, and, to a limited extent, the merits of its conclusions. On July 17, 1991, plaintiff filed his opposition to Everex's motion and the matter now comes on for hearing.

## II. ANALYSIS.

### A. The Standard of Review.

In *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), the Supreme Court held that a special litigation committee has the power to terminate a derivative action to the extent allowed by the law of the state of incorporation. *Id.*, at 486, 99 S.Ct. at 1841. Everex is incorporated in Delaware, and under Delaware law, a special litigation committee has the power to terminate a derivative action under certain circumstances. 8 Del.Code §§ 141(a) & (c); *Zapata v. Maldonado*, 430 A.2d 779 (Del.1981) (hereinafter "Zapata").

■ Under *Zapata*, a special litigation committee may terminate a derivative action with leave of the court following an appropriate motion to terminate by the af-

---

**4.** Committee Counsel interviewed defendants Avis, Wong, Yu, Chan, and Everitt. Additionally, committee counsel interviewed: Chris Leslie, Everex's Corporate Counsel; Michael McClosky, Everex's Vice President of Finance; Alan Bushnell, Everex's Vice President of Operations; Anne Butler, Everex's Investor Relations Manager; Bruce Dunlevie, Everex's Vice President of Computer Systems and Corporate Development; Eric Zimits, an outside financial analyst employed by Rauscher Pierce Refsnes, Inc.

fected corporation. *Id.* In *Zapata,* the Supreme Court of Delaware laid out a two step standard of review applicable to motions to terminate derivative actions based on the recommendation of an SLC:

> *First,* the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions. Limited discovery may be ordered to facilitate such inquiries. The corporation should have the burden of proving independence, good faith and reasonable investigation.... If the Court determines either that the committee is not independent or has not shown reasonable bases for its conclusions ... the Court shall deny the corporations motion. If, however, the Court is satisfied under Rule 56 standards that the committee was independent and showed reasonable bases for good faith findings and recommendations, the Court may proceed, in its discretion, to the next step....

> *[Second,]* [t]he Court should determine applying its own independent business judgment, whether the motion should be granted. This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith decisions and still have the corporation's motion denied. The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit,.... If the Court's independent business judgement is satisfied, the Court may proceed to grant the motion, subject, of course, to any equitable terms or conditions the Court finds necessary or desirable. *Zapata,* 430 A.2d at 788–89 (emphasis added).

Because the power to bring a motion to terminate a shareholder derivative suit under *Zapata* emerges from state law, the place of such a motion within the procedural framework established by the Federal Rules of Civil Procedure is unclear, at least at first glance.

Without explicitly ruling on the issue, some courts have treated a motion to termi-nate as one for summary judgment brought under Rule 56. *See e.g., Gaines v. Haughton,* 645 F.2d 761 (9th Cir.1981) (interpreting California law). Other courts have treated this type of motion as one which borrows heavily from Rule 56, but which ultimately arises under Rule 23.1. *Peller v. Southern Co.,* 911 F.2d 1532, 1538–39 (11th Cir.1990) (applying Delaware law).

Finally, Delaware courts have defined a motion to terminate *sui generis,* referring to it as neither a "neither a motion to dismiss under Rule 12(b), nor ... a motion for summary judgment pursuant to Rule 56.... Rather, the motion is a hybrid one, derived by analogy to a motion to dismiss a derivative suit based upon a voluntary settlement...." *Kaplan v. Wyatt,* 484 A.2d 501, 506–07 (Del.Ch.1984) *aff'd* 499 A.2d 1184 (Del.1985).

■ The Court finds that the view adopted by the Eleventh Circuit in *Peller* is the best view. Rule 23.1 provides in relevant part:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ..., the corporation ... having failed to enforce a right which may be properly asserted by it,.... The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation.... The action shall not be dismissed or compromised without the approval of the court.... Fed.R.Civ.P. 23.1.

The above quoted terms of Rule 23.1 clearly contemplate judicial review of the conduct of derivative actions to insure that the actions are in the best interests of the corporation, and in the best interests of absent shareholders who may be affected by the outcome of the suit. The review of SLC reports contemplated by *Zapata* falls within the ambit of the judicial review called for by Rule 23.1.

Of course, Rule 23.1 does not establish a standard of review to be applied to motions brought under *Zapata.* Following the lead

of *Zapata* itself, courts have looked to Rule 56 for guidance on these issues. For instance, in *Kaplan v. Wyatt,* 484 A.2d 501 (Del.Ch.1984) *aff'd* 499 A.2d 1184 (Del. 1985), the court found that the corporation moving for termination bears a burden of proving the independence, good faith, and reasonability of the SLC's review by evidence sufficient to eliminate any genuine questions of fact with regard to these issues. *Id.*

■ However, it is clear from *Kaplan* and *Peller* that the use of the standard of review commonly associated with Rule 56 has not converted *Zapata* motions into motions for summary judgment under Rule 56. For example, when considering a plaintiff's motion for summary judgment under Rule 56, the Court does not make determinations of credibility or weigh conflicting evidence. *T.W. Electric Service, Inc. v. Pacific Elec. Contractors,* 809 F.2d 626, 630–31 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). Yet determinations of credibility are essential to the first step of a *Zapata* review, which requires the Court to consider the biases, interests, independence, and good faith of the SLC. Moreover, the Court must weigh conflicting evidence to conduct the discretionary second step of a *Zapata* review, which requires the Court to apply its own independent business judgment in light of the entire evidentiary record.

■ Similarly, a plaintiff whose motion for summary judgment is denied under Rule 56 nonetheless retains the right to proceed to trial in the absence of a successful cross-motion for summary judgment by defendants. In contrast, where courts have denied a *Zapata* motion to terminate because, for example, the SLC's report was not prepared in good faith, the movant has not retained a right to proceed to a full bench trial of the issues raised by the motion to terminate. *Peller v. Southern Co.,* 911 F.2d 1532 (11th Cir.1990).[5] This limitation is in accord with the underlying efficiency rationale of the *Zapata* rule. It would be, at best, inconsistent with the purposes of *Zapata* to hold a full trial on the issue of whether or not the suit merits a full trial.

In sum, then, Everex's motion to terminate shareholder derivative litigation will be treated as one brought under Rule 23.1. The standard of review is determined by Delaware law, and Delaware has chosen to apply a standard commonly applied to motions for summary judgment brought under Rule 56. Thus, Everex bears the burden to support its motion for termination with evidence sufficient to eliminate genuine issues of fact as to the SLC's independence, good faith and reasonability.

■ If the Court finds that Everex has not carried this burden, then Everex's motion will be denied and Johnson's suit will proceed under Johnson's control. Alternatively, if Everex carries its initial burden regarding a first-step analysis under *Zapata,* then the Court, at its discretion, may nonetheless deny Everex's motion if it determines that the policies which derivative litigation were meant to serve would be furthered by allowing the litigation to go forward in the hands of plaintiff Johnson, or if the Court finds that the unique circumstances of this case present other reasons for allowing Johnson to pursue the action further.

It is important to note that this second level of analysis is not one which is conducted with reference to any evidentiary burden placed on the parties. Rather, should the Court exercise its discretion to conduct this second level of review, the Court will do so on the basis of the entire record in this matter viewed in light of

---

**5.** Defendant Everex argues that if the Court denies its motion to terminate the litigation because the SLC, say, did not act in good faith, then Everex retains the right to proceed to full bench trial of the good faith issue. *Lewis v. Anderson,* 615 F.2d 778 (9th Cir.1980). *Lewis* does support this argument. Under *Zapata* and Rule 23.1 the Court may order evidentiary hearings *before* ruling on a motion to terminate, and this type of proceeding went forward in *Lewis. Lewis,* however, does not stand for the proposition that the corporation retains the right to a proceed to a bench trial *after* the court has ruled on all issues raised by a *Zapata* motion.

equity, law, and public policy. *Kaplan v. Wyatt*, 484 A.2d 501, 508–09 (Del.Ch.1984).

### B. The Good Faith And Independence Of The SLC.

To determine whether or not the SLC has acted independently and in good faith, the Court must review the totality of the circumstances to determine whether the members of the SLC are "in a position to base [their] decision on the merits of the issue rather than ... extraneous considerations or influences." *Kaplan v. Wyatt*, 499 A.2d 1184, 1189 (Del.1985). Applying this totality of the circumstances test, courts have highlighted the following six factors:

1. *Status as a defendant, and potential liability:*

Courts have found SLC's independent and unbiased even though a member of the SLC is a nominal defendant or subject to small or indirect liability. However, where liability may be direct and substantial the SLC's independence may be questioned. *Mills v. Esmark, Inc.*, 544 F.Supp. 1275, 1283 (N.D.Ill.1982) (merely nominal defendant); *compare In re General Tire & Rubber Co. Securities Litigation*, 726 F.2d 1075, 1083–84 (6th Cir. 1984) *and Lewis v. Anderson*, 615 F.2d 778 (9th Cir.1979) *with Abbey v. Control Data Corp.*, 603 F.2d 724 (8th Cir.1979).

2. *Participation in or approval of the alleged wrongdoing:*

Once again the participation and/or approval must be substantial, and not the result of innocent or *pro forma* involvement or affiliations. *Mills v. Esmark, Inc.*, 544 F.Supp. 1275, 1283 (N.D.Ill. 1982); *Kaplan v. Wyatt*, 499 A.2d 1184, 1189 (Del.1985); *see Bach v. National Western Life Insurance Co.*, 810 F.2d 509, 513 (5th Cir.1987).

3. *Past or present business dealings with the corporation:*

*Hasan v. CleveTrust Realty Investors*, 729 F.2d 372, 378–79 (6th Cir.1984); *Rosengarten v. Buckley*, 613 F.Supp. 1493 (D.Md.1985); *In re General Tire & Rubber Co. Securities Litigation*, 726 F.2d 1075, 1083–84 (6th Cir.1984).

4. *Past or present business or social dealings with individual defendants:* *Lewis v. Fuqua*, 502 A.2d 962, 966–67 (Del.Ch.1985); *Hasan v. CleveTrust Realty Investors*, 729 F.2d 372, 378–79 (6th Cir.1984)

5. *The number of directors on the SLC:*

The larger the number of directors, the less weight accorded to any disabling interest affecting only one director. *Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch.1985).

6. *The "structural bias" of the SLC:*

Here the court considers whether manner in which the SLC was appointed and proceeded was one which was inevitably bound to be empathetic to defendants, and, therefore, biased in favor of terminating the litigation. *Lasker v. Burks*, 567 F.2d 1208 (2d Cir.1978); *Joy v. North*, 692 F.2d 880 (2d Cir.1982).[6]

■ Applying these factors here, the Court finds that the SLC was independent and acted in good faith. There is little or no evidence that SLC member Robert Louthan is biased or interested under any of the factors just discussed. At the time of the alleged wrongdoing Louthan was an independent consultant who had no identified business or personal relationship with Everex or any of the defendants. Louthan became a director of Everex in February of 1991. However, Louthan has not been named as a defendant, and plaintiff has not alleged that Louthan participated in or approved of the insider trading scheme asserted by Johnson in his complaint. Plaintiff alleges that Louthan discussed an unidentified business arrangement with cer-

---

**6.** Some interpreters of these Second Circuit cases have suggested that they stand for the proposition that SLC's are inherently biased and untrustworthy. *See e.g. Joy v. North*, 692 F.2d 880 (2d Cir.1982) (J. Cardamone, dissenting). If, they argue, the defendant directors did not expect that the SLC would recommend termination, the directors would never vote to ap-

point an SLC. *Id.* The Court does not adhere to this interpretation of Second Circuit cases, and finds, in any event, that this interpretation is at odds with Delaware law. If SLC's are all viewed as inherently biased then the purpose of the *Zapata* rule, *ie.* to allow SLC's to terminate derivative litigation in appropriate cases, will be frustrated entirely.

tain of the defendants roughly two months before he was appointed to the SLC. There is no evidence, though, that this alleged business arrangement ever moved beyond the stage of speculative discussion, or, more significantly, that the success or failure of this venture is in any way connected with Louthan's performance as a member of the SLC.

Similarly, there is no evidence that the SLC's counsel, Morrison & Foerster, are biased or have any improper interest in this matter. There is also no evidence that attorneys from Morrison & Foerster have had any personal or business contacts with Everex or the individual defendants, other than in its role as committee counsel.

The record with regard to Teal is not void of evidence related to interest or bias. Teal is a named defendant in this action. Teal is also a director of Everex, and, in that capacity presumably has business and personal contacts with other defendant directors of Everex. These facts, however, do not demonstrate the sort of substantial bias or interest which would cause the Court to question the SLC's ability "to base [its] decision on the merits of the issue rather than ... extraneous considerations or influences." *Kaplan v. Wyatt,* 499 A.2d 1184, 1189 (Del.1985).

While Teal is named as a defendant, it is undisputed that he did not sell Everex stock during the alleged period of insider trading, or at any other time. Nor is there any evidence that Teal drafted press releases or otherwise actively participated in the pattern of misconduct alleged by plaintiff Johnson. Thus, Teal's nominal appearance as a defendant does not undermine his ability to operate as an independent and unbiased member of the SLC. *Mills v. Esmark, Inc.,* 544 F.Supp. 1275, 1283 (N.D.Ill. 1982).

Moreover, even if the evidence suggests that Teal is tainted to some degree, this taint does not rise to the level where the Court should conclude that the SLC is tainted. Teal is not the only member of the SLC, and there is no indication that the objectivity of Louthan or committee coun-

sel were overborne by the arguments or conduct of Teal.

For the reasons just stated, the Court finds that the Everex SLC was independent and acted in good faith.

## C. The SLC's Conclusion Has A Reasonable Basis In The Record.

In its April 15, 1991, report, the SLC concluded that it was not in the interest of Everex to further pursue Johnson's derivative suit. The SLC's reasoning in support of its conclusion that Johnson's derivative suit should be terminated is stated clearly in its Report, and will not be reiterated in full detail here. However, a summary review of the SLC's analysis may be helpful.

With regard to the defendants knowledge of Everex's alleged financial distress, the SLC concluded that there was insufficient evidence to support the conclusion that Everex was experiencing financial distress, or that defendants had any knowledge of this alleged distress.

Moreover, the SLC concluded that defendants' alleged scheme to mislead the market through optimistic press releases has little or no evidentiary basis. Most press releases included only publicly available information previously stated in Everex's quarterly reports. It is now undisputed that Everex's releases regarding new products and new deals were timely and accurate. With regard to Everex's alleged August 14, 1989 announcement that it had received a contract from the U.S. Postal Service, it is now undisputed that the announcement was not made by Everex, and that Everex was a subcontractor not the recipient of the prime contract.

Finally, the SLC concluded that defendants all sold stock following trading patterns inconsistent with the insider trading scheme alleged by defendants. Most stock sales were made during "window periods" established by Everex for the sale of stock by directors. These "window periods" began a few days after the release of quarterly financial reports and continued for ten days. Additionally, most sales follow financial plans which arose prior to the alleged insider trading period, and over six-

ty percent of the alleged insider trades were made at a price *lower* than the market price of Everex's stock following Everex's October 18, 1989 press release which allegedly confessed Everex's weak financial position to market analysts and the public.

The conclusions of the SLC appear well reasoned, and are substantially supported by the evidence relied on by the SLC in its Report, as well as by the evidence submitted by Everex in support of its motion to terminate.

Plaintiff Johnson challenges the conclusion of the report, and attempts to raise a genuine issue of fact, in two ways. First, Johnson argues that the SLC "ignored or discounted compelling evidence of defendants' knowledge of the imminent Everex market slowdown and subsequent insider selling." Plaintiff's Memorandum [7] at 24. Specifically, Johnson notes that at a September 5, 1989 Everex board meeting defendant Hui made statements recorded in contemporaneous notes as follows:

> The computer industry is in a period of consolidation with lower sales generally. [Hui] reported that some of the Company's major customers were experiencing a 50% slowdown in sales. He noted that diversification of [Everex's] product line had resulted in a lesser impact on [Everex] of the general sales slow-down than felt by some competitors....

> [Everex] has concentrated on inventory control and selective increases in sales and its gross margins have been steadily increasing. [Everex's] operating income has increased largely due to a shift in [Everex's] product, from emphasis on [peripherals to computers systems....] He advised the directors that [Everex] intended to increase its product development expenditures to maintain and expand its competitive product base.

Plaintiff contrasts this purportedly pessimistic statement to Everex insiders with the following statement in a press release issued on September 6, 1991:

Steven Hui, president of Everex, attributed the excellent [fourth quarter] results to continued strong demand for Everex's product line and to further improvement in gross margin. 'Our gross profit margin increased from 27.4% in the third quarter to 28.5% in the fourth quarter. This reflects strong demands for our systems products [....]' Personal computer sales accounted for 58% of sales in the fourth quarter versus 55% during the third quarter and 50% in the second quarter of fiscal 1989.

Plaintiff's argument here is entirely unpersuasive. Initially, the supposed contradiction between Hui's statements to insiders and Everex's press release to the public is subtle to the point of obscurity. Admittedly, in his statement to the Board Hui noted the existence of a slowdown in the computer market, and its effects on some Everex customers. However, in both his statement to the Board and in Everex's press release Hui emphasized his belief that Everex would remain profitable based on Everex's continuing successful transition away from peripherals and toward computer systems.

Furthermore, to the extent Hui's statement to the Board contained information omitted from the press release, it did not contain idiosyncratic inside information about Everex. The only information omitted from the press release is Hui's generic statement about the state of the computer industry, and the problems of other computer companies. This is primarily public information.

In addition to Johnson's limited attack on the merits of the SLC's conclusion, Johnson urges the Court to discredit the SLC's Report because of its methodology. Johnson argues that the SLC placed excessive reliance on committee counsel citing *Peller v. The Southern Co.*, 911 F.2d 1532 (11th Cir.1990).

Johnson also notes that the SLC Report fails to consider certain factors which Johnson asserts should have been central to the

---

7. In full, Plaintiff's Memorandum of Points and Authorities in Opposition to Motion of Everex Systems, Inc., to Terminate Shareholder Deriva-
tive Action Pursuant To Fed.R.Civ.P. 56, filed on July 17, 1991.

SLC's deliberations. These factors include: (1) the availability of insurance coverage and the possible affect of an adverse judgment on Everex's future insurance costs; (2) the possibility of indemnification; (3) the cost of litigation; and (4) the consumption of management's time defending litigation and the resultant impairment of management's ability to conduct ongoing business. Plaintiff's Memorandum at 16–17.[8]

Finally, Johnson attacks the manner in which the SLC interviewed witnesses. Johnson complains that these interviews were too short in duration, were not conducted with the informant under oath, and were not transcribed.

Johnson's attack of the SLC's investigative methodology is unavailing. With regard to use of counsel, Johnson is correct to suggest that the SLC's use of committee counsel is subject to judicial scrutiny. SLC's, however, have been praised just as often as castigated for their reliance on competent counsel. *See e.g., Grafman v. Century Broadcasting Corporation,* 762 F.Supp. 215, 220 (N.D.Ill.1991) ("Another indicia of good faith and reasonableness of the investigation is the use of capable counsel."); *Kaplan v. Wyatt,* 499 A.2d 1184, 1191 (Del.1985). The issue before the Court now is not whether the SLC's reliance on counsel was substantial, but whether the SLC's reliance on counsel amounts to an abdication by the SLC of its investigative role, or renders the SLC's conclusions unreasonable or unreliable. In the context of the present suit, the SLC's substantial reliance on Morrison & Foerster to gather documents and interview witnesses does not appear to have affected the independence of the SLC, the reliability the SLC's evidence gathering, or the reasonability of the SLC's analysis.

Johnson's remaining attack on the SLC's methodology is equally flawed. In light of the SLC's conclusion that Johnson's factual allegations were without sufficient support, it is hard to see how the SLC's consideration of any of the "critical factors" listed by Johnson could have—or should have—affected the SLC's conclusions. Indeed, a further analysis of most of these factors militates against allowing the litigation to proceed. For example, it is hard to imagine how the high monetary cost of further litigation could tip the scales in favor of Johnson and cause the SLC to recommend that the litigation be allowed to continue. The same can be said of the disruptive affect of litigation on day-to-day management, and the possible affect of an adverse judgment on Everex's insurance.

Finally, Johnson's objection that witness interviews were too short and were not transcribed is not dispositive. Of course, long transcribed interviews might provide both substantive support for the SLC's conclusions and evidence of the SLC's good faith. But the absence of long transcribed interviews does not undermine the undisputed facts which the SLC has managed to prove without the aid of long transcribed interviews. It is important to note that most of the facts relied on by the SLC are not even disputed by Johnson's allegations, much less by contradictory evidence. While the record could be longer, it is now long enough to adequately support Everex's motion to terminate the present litigation.

### D. The Court Should Decline To Conduct A Second Step Analysis.

As we noted at the outset, even if the SLC's recommendation to terminate the litigation was prepared independently, in good faith, and presents conclusions with a reasonable basis in the record, the Court may nonetheless refuse to terminate the action on the basis of a discretionary second-step analysis. *Zapata v. Maldonado,* 430 A.2d 779, 788–89 (Del.1981). Specifically, the Court may "determine, applying its own independent business judgment, whether the motion should be granted." *Id.* "The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear

8. Johnson also argues that the SLC did not consider the merits of his claim. This argument is patently implausible. The SLC report is re-

plete with analysis of factual allegations essential to Johnson's claims here.

to satisfy its spirit...." *Zapata,* 430 A.2d at 788–89.

At first glance, the analytic process by which courts decide whether or not to carry out the "discretionary" second-step analysis created by *Zapata* appears fundamentally imprecise. For instance, it is unclear how the threshold issue of whether or not to engage in a discretionary second-step analysis can be held discrete from the substance of the second-step analysis itself. It seems obvious that a court cannot consider the case before it in order to decide whether or not the case warrants a second-step analysis without considering the legal and factual questions involved in the substance of a second-step analysis. Nor do *Zapata* or its descendants provide a principled basis for sorting a second-step analysis out from a first-step review for independence, good faith, and reasonability. *Zapata's* second-step analysis appears to be, at best, undefined, and at worst, an illusory legal fiction which serves only to create an unprincipled judicial veto power over otherwise well taken motions to terminate derivative litigation.

Below the surface of *Zapata's* terms, though, are legitimate concerns which both serve to distinguish the first and second steps of a *Zapata* analysis and provide some guidance to the Court. Undoubtedly, the second-step procedure was adopted in recognition of the atypical evidentiary posture of a motion to terminate brought under *Zapata.* While the party seeking termination is permitted to develop the merits of the claims at issue in an unlimited fashion, the party seeking to defeat termination has little or no opportunity to conduct merits discovery before the Court decides whether the claim should be terminated.[9] The second step of the *Zapata* procedure, then, serves as a judicial back-stop to prevent SLC's from manipulating their procedural advantages to terminate meritorious derivative claims. It can be, to use plaintiff's phrase, an imprecise "smell test" allowing the court to search between the lines of the SLC's report for the scent of a meritorious claim enclosed within a record that has not been opened by truly adversarial proceedings.

■ With this purpose in mind, the court conducting a second-step analysis must independently consider the essential merits of plaintiff's claim. Moreover, the Court must determine, through the exercise of its independent business judgment, whether the facts and legal authorities placed before the court establish that continuing the derivative litigation will benefit of the corporation on whose behalf the derivative claim is presented.

■ Here, the asserted theories of liability and the evidentiary record have already been summarized in this Order. In the Court's view, plaintiff's core liability theory—*ie.* that defendants masked their knowledge of Everex's financial weakness—is one which is not likely to prevail. Most obviously undercutting plaintiff's core theory is the undisputed evidence submitted by the SLC that Everex is not now, nor has it been, financially weak. There was, in other words, scant adverse financial information for the defendants to hide. Equally important, it appears to this Court that the available and realistically discoverable evidentiary support for the existence of actual misrepresentation, omission, or scienter simply lacks the convincing force necessary for plaintiff to prevail.

On the other side of the balance, it appears to the Court that Everex's use of the SLC mechanism in this matter is the product of a sound business decision which furthers the interests of Everex. The reasonability of the SLC's report, when read alone, has already been discussed in this order. In a second-step analysis the Court may review the SLC's report in the broad

---

**9.** This one-sided development of the evidentiary record flatly contradicts the policy favoring liberal discovery and resolution on the merits which is reflected throughout the Federal Rules of Civil Procedure. Nonetheless, strict limitation of the plaintiffs ability to take discovery regarding the SLC's report arises as an essential corollary of *Zapata's* efficiency rationale: Allowing adversarial discovery on the merits would eviscerate the SLC's power in a way that Delaware law has deemed more timely and cost effective than full litigation under the Federal Rules of Civil Procedure.

context of the management history of Everex. In this context the conclusions of the SLC appear even more sound. The record discloses a history of good business judgment exercised by Everex's directors on behalf of Everex and Everex's shareholders. There is no basis in this record for this Court to take the extraordinary step of substituting its own business judgment for that of the Everex SLC.

Exercising its second-step review then, the Court concludes that this is not a case where the Court should decline to grant the motion to terminate despite the Court's prior conclusion that the SLC's termination recommendation has been made independently, reasonably, and in good faith.

## III. CONCLUSION.

For the reasons discussed above, Everex's motion to terminate Johnson's shareholder derivative claim is GRANTED. Johnson's shareholder derivative claim is DISMISSED WITH PREJUDICE.

IT SO ORDERED.