**Robert STROUGO, on Behalf of THE BRAZIL FUND, INC., Plaintiff,**

**v.**

**Juris PADEGS, Nicholas Bratt, Edgar R. Fiedler, Roberto Teixeira Da Costa, Ronaldo A. Da Frota Nogueira, Wilson Nolen, Edmond D. Villani, and Scudder, Stevens & Clark, Inc., Defendants.**

**and**

**The Brazil Fund, Inc., Nominal Defendant.**

**Robert Strougo, on behalf of himself and all others similarly situated, Plaintiff,**

**v.**

**Juris Padegs, Nicholas Bratt, Edgar R. Fiedler, Roberto Teixeira Da Costa, Ronaldo A. Da Frota Nogueira, Wilson Nolen, Edmond D. Villani, and Scudder, Stevens & Clark, Inc., Defendants.**

**No. 96 Civ. 2136(RWS).**

United States District Court,
S.D. New York.

Nov. 18, 1998.

Wechsler Harwood Halebian & Feffer by Joel C. Feffer, Jeffrey M. Haber, New York City, for plaintiff.

Simpson Thacher & Bartlett by Michael J. Chepiga, Chet A. Kronenberg, New York City, for nominal defendant The Brazil Fund Inc.

Debevoise & Plimpton by John S. Kiernan, Jeremy Feigelson, Edward V. Di Lello, New York City, for defendants Scudder, Stevens & Clark, Inc., Juris Padegs, Nicholas Bratt and Edmond D. Villani.

## OPINION

SWEET, District Judge.

Nominal defendant The Brazil Fund, Inc. (the "Fund") has moved to dismiss the shareholder derivative complaint of Robert Strougo ("Strougo") under Rule 12(b)(6), Fed.R.Civ.P., or, in the alternative, for summary judgment pursuant to Rule 56, Fed.R.Civ.P, based upon the determination of a special litigation committee of its Board of Directors (the "SLC") that the continued

prosecution of this action is not in the best interests of the Fund and its shareholders.

Plaintiff Strougo has moved to remove defendants' designation as confidential, pursuant to the Confidentiality Order dated May 10, 1998, the minutes of a meeting of the Board of Directors of the Fund, held on February 15, 1994.

For the reasons set forth below, The Fund's motion is granted, and Strougo's motion is denied.

### Prior Proceedings

The parties, procedural and factual background of this action are set forth in the prior opinions of the Court, familiarity with which is assumed. *See Strougo v. Padegs,* 1 F.Supp.2d 276 (S.D.N.Y.1998); *Strougo v. Padegs,* 986 F.Supp. 812 (S.D.N.Y.1997); *Strougo v. Padegs,* No. 96 Civ. 2136, 1997 WL 473566 (S.D.N.Y. Aug.18, 1997); *Strougo v. Padegs,* 964 F.Supp. 783 (S.D.N.Y.1997). Prior proceedings and facts relevant to this motion are set forth below.

Without making a prior demand on the Board, Strougo filed his initial complaint in this Court on March 22, 1996. He filed the first amended class action and verified shareholder derivative complaint (the "Complaint") on June 17, 1996, alleging improprieties arising out of a rights offering by the Fund on November 20, 1995 (the "Rights Offering").

The defendants Scudder, Stevens & Clark, Inc. ("Scudder") and the Directors of the Fund moved to dismiss the Complaint for, among other things, (i) failure to state a claim, and (ii) with respect to Strougo's derivative claims, failure to make a prior demand on the Fund's Board of Directors. By opinion and order dated May 6, 1997 (the "Order"), Strougo's direct class action claims alleging breach of fiduciary duty under section 36(a) of the Investment Company Act of 1940, as amended (the "ICA"), and under Maryland law, were dismissed as was the excessive compensation claim against Scudder and the directors who were employed by Scudder under ICA § 36(b).

The motions to dismiss the derivative claims alleging breach of fiduciary duty were denied except with respect to Roberto Teixeira da Costa ("Da Costa"), an outside director and a resident Brazilian director of the Fund, as was the motion by Scudder and the directors who were employed by Scudder to dismiss Strougo's ICA § 48(a) control person claim. Pre-suit demand was excused because six of the Fund's seven directors were "interested" in the Rights Offering.

The defendants moved for reargument or, in the alternative, for certification of the order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) which motion was denied by opinion and order dated August 15, 1997. On September 10, 1997, the Fund moved to stay all proceedings for three months to permit the SLC to investigate allegations of the lawsuit and act in accordance with the findings of that investigation. The motion was granted by opinion and order dated December 1, 1997.

On December 5, 1997, the Fund moved pursuant to Rules 12(b)(6) and 56, Fed.R.Civ. P., to terminate and dismiss the action based upon the report of the SLC. By opinion and order dated April 6, 1998, the motions were adjourned for sixty days pending further discovery by Strougo.

The motion was deemed renewed on July 29, 1998. On August 12, 1998, Strougo moved to remove confidentiality as to the minutes of a meeting of the Board of Directors of the Fund. Opposition and reply papers on the motions were received through September 9, 1998, at which time the motions were considered fully submitted.

### The Facts

The Fund is a non-diversified, closed-end investment company registered under the ICA, and incorporated under the laws of Maryland. The Fund invests almost exclusively in securities of Brazilian companies and commenced operation in 1988 with an issuance of common stock in an initial public offering. The Fund is managed by its investment advisor, Scudder. Scudder is paid a fee equal to a percentage of the Fund's average weekly net assets.

This action arises from the decision by the Fund's Board of Directors in October 1995, to raise additional capital—approximately $61 million—through the Rights Offering. The Rights Offering provided that each Fund

shareholder would receive one right for each share held and that three rights would entitle the holder to buy an additional Fund share at a discount to the current trading price of the stock. Shareholders who did not wish to exercise their rights could sell the rights on the New York Stock Exchange, where the rights were listed, or on the Chicago Stock Exchange. The prospectus for the Rights Offering (the "Prospectus") stated that its purpose was to raise new capital in order to take advantage of new investment opportunities in Brazil without having to sell existing portfolio holdings thereby triggering capital gains. Strougo alleges, however, that "[t]hough purporting to raise money to take advantage of future investment opportunities in Brazilian securities, defendants' desire to conduct the Rights Offering was motivated by the desire to increase [Scudder's] fees." Complaint ¶ 79. Strougo alleges that as a result of the "coercive" Rights Offering, plaintiff and the other shareholders of the Fund, as well as the Fund itself, suffered harm in the form of market and dilution damages. According to the Complaint, Rights Offerings "cause a loss to existing shareholders" because they "dilute the pro rata holdings of ... stock held by the fund allocable to existing shares [, and] because investment banking fees and other transactional costs are incurred by the closed end fund." Complaint ¶¶ 25–26. Moreover, Strougo alleges that the market value of the Fund's shares was depressed below what it would have been had the Rights offering not been made. The Complaint also alleges that the Prospectus fails to articulate a single coherent reason justifying the Rights Offering.

By resolutions dated May 28, 1997 (the "Resolutions"), following the resolution of certain of the matters described above, the Board of Directors of the Fund (i) created the SLC and delegated to that committee the powers of the Board to investigate Strougo's allegations and determine whether this litigation is in the Fund's best interests, and (ii) appointed Da Costa as a member of the SLC. Thereafter, Da Costa, pursuant to the Resolutions, nominated Kenneth C. Froewiss ("Froewiss") as a new member of the Board

of Directors, and Da Costa appointed Froewiss as an additional member of the SLC.

Da Costa is the founder of the Comissaro de Valores Mobiliarios, the Brazilian equivalent of the United States Securities and Exchange Commission. He served as its first president for three years and currently is the vice-chairman of Sul America, a Brazilian investment bank that is owned by the largest insurance company in Brazil of the same name and is also a member of the board of directors of several Brazilian companies. From 1988 through 1993, Da Costa served as a member of the Advisory Board of the Fund. In 1993, the Fund eliminated the Advisory Board. Shortly thereafter, Da Costa became a member of the Board of Directors. The SLC asserts that Da Costa has no business, personal or family ties with any of the other directors of the Fund. Strougo maintains that Da Costa and Edmond Villani ("Villani"), a director of the Fund and the president and managing director of Scudder, are "good friends."

The action against Da Costa, originally a defendant, was dismissed on the grounds that there was no basis to infer that Da Costa "would not act in the Fund's best interest." Order at 9.

Froewiss was elected to the Fund's Board over one year after the complaint was filed. Froewiss obtained a Ph.D in economics from Harvard University in 1977 and thereafter worked as an economist at the Federal Reserve bank of San Francisco. Froewiss was employed at J.P Morgan in New York as an economist in the treasury area and then from 1982 until 1984, worked at Goldman Sachs. In 1984, Froewiss returned to J.P. Morgan, first to run a research group and then to work as an investment banker specializing in insurance and mutual fund companies. In late 1996, Froewiss was appointed an adjunct professor at New York University's Stern School of Business and was named a visiting professor in September 1997.

The record to date indicates that Froewiss has no business, personal or family ties with any of the other directors of the Fund.

On July 10, 1997, the SLC retained Michael J. Chepiga and the law firm of Simpson

Thacher & Bartlett ("ST & B") as independent counsel to assist the SLC in its investigation. Chepiga is a litigator with extensive experience in securities and financial litigation and investigations. He was assisted by Gary Schpero, a corporate attorney and the head of the firm's investment fund practice group, and litigation associate Chet Kronenberg.

The SLC held its first organizational meeting on July 24, ·1997. From July through November 1997, the SLC and its counsel interviewed eleven witnesses, and counsel reviewed over 30 boxes of documentary materials. Strougo and his counsel did not participate in the SLC's investigation, although invited.

The SLC interviewed the three Scudder directors (Nicholas Bratt, Juris Padegs and Villani), the three Outside Directors (Edgar Fiedler, Ronaldo A. Da Frota Nogueira and Wilson Nolen), three representatives of Scudder (Edmund Games, Judith Hannaway and John Hebble) and two representatives of Smith Barney (Beau Ogden and Michael Porter). Additionally, the SLC conducted follow-up interviews of Bratt, Hannaway, Hebble and Padegs.

Each interview was attended and conducted by both SLC members (or, with respect to a few interviews, one SLC member) and their independent counsel. The SLC's counsel drafted a memorandum summarizing each interview, which was approved for completeness and accuracy by the SLC members. These interview memoranda were not shared with or given to anyone other than the SLC and its counsel.[1]

In addition, the SLC's counsel and the SLC reviewed numerous newspaper and magazine articles from the United States financial press regarding rights offerings during the relevant time period.

On October 28, 1997, the SLC and its counsel reviewed the facts developed in the course of the SLC's investigation and the options available to the SLC. At the October 30, 1997 SLC meeting, the SLC determined that it had completed its investigation into the allegations of the Complaint, that the allegations had no merit and that termination of this lawsuit is in the best interests of the Fund and its shareholders and that pursuit of the Strougo litigation would be costly, distracting and would result in negative unjustified publicity for the Fund.

The SLC's factual findings and its conclusions set forth that the Rights Offering was motivated by the desire to take advantage of investment opportunities in Brazil and that Scudder and the Fund's directors believed that the decline in the Fund's stock price was attributable primarily to the so-called "tequila effect" following Mexico's devaluation of its currency in December 1994 and not to any underlying economic problems in Brazil. The SLC did not find any evidence that Scudder and the Scudder directors proposed the Rights Offering to increase Scudder's fees or that the loyalty of the Outside Directors was to Scudder instead of to the Fund and its shareholders.

The Report states that the Fund's Board considered all of the various structural components of a rights offering (e.g., size/ratio of rights offering, transferable/nontransferable, fixed/variable pricing, over-subscription option, selling group) and approved, at Smith Barney's recommendation, the use of a selling group (i.e., an underwriting syndicate) which limited the effect of arbitrageurs on the Rights Offering. Scudder and the Fund's directors also made several efforts to ensure that foreign shareholders had the opportunity to participate in the Fund's Rights Offering. The Report found that Scudder and the Fund's directors considered (i) the fact that rights offerings are dilutive and generally have a near-term impact on market price; (ii) various issues with regard to the setting of the subscription price; and (iii) the anticipated expenses of the Rights Offering, including but not limited to the utility and expense of Smith Barney as lead underwriter and payments to selling group members.

The SLC also concluded that continuation of the lawsuit is not justified on the basis of

1. The interview memoranda are included in the Exhibits to the SLC's Report, which has been submitted on this motion.

any potential recovery from defendants for harm to the Fund since ninety-two percent of the Fund's shareholders subscribed in the Rights Offering and sixty-one percent oversubscribed, resulting in 2.7 million oversubscribed shares. In addition, the Report noted that while there was a near term drop in the market price of the Fund's stock due to the infusion of new shares at a discount, the price rebounded in six weeks to the same price that the Fund's shares traded at right before the Rights Offering was announced so that for every three shares that subscribing shareholders previously owned, they now owned at the same three shares at the same price, plus a fourth share that they were able to purchase at a substantial discount. In addition, non-subscribing shareholders owned shares that had the same market value as before, plus any money earned from selling the rights attached to those shares. Finally, the Report noted that the Rights Offering benefitted shareholders because the Fund was able to take advantage of investment opportunities in Brazil without selling existing assets, which would have triggered taxes for shareholders. *See* Report at 41–46.

## Discussion

### I. *The Fund's Motion to Terminate is Granted*

Strougo's remaining claims are (i) breach of fiduciary duty against Scudder, the Scudder Directors and the Outside Directors under ICA § 36(a) and Maryland law, and (ii) control person liability under ICA § 48(a) against Scudder and the Scudder Directors.

With respect to the breach of fiduciary duty claims, Strougo alleges that defendants "breached their duty of loyalty by failing to put the interests of the Fund and its shareholders before those of others, including [Scudder], and have breached their fiduciary duty of care by failing to adequately consider the negative effect the Rights Offering would have on the Fund." Complaint ¶¶ 105, 109.

With respect to the control person claim, Strougo alleges that Scudder caused all the directors to violate ICA § 36 and that the

Scudder Directors caused the Outside Directors to violate ICA § 36.[2]

### A. *Standard of Review*

■ A special litigation committee has the power to terminate a derivative action to the extent allowed by the state of incorporation. *See Burks v. Lasker,* 441 U.S. 471, 486, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). The Fund is incorporated in Maryland, and under Maryland law, a committee of disinterested and independent directors of a corporation may move to terminate a pending shareholder derivative action which the committee determines in good faith to be contrary to the corporation's best interests. *See e.g., O'Donnell v. Sardegna,* 336 Md. 18, 26, 646 A.2d 398, 402 (Md.1994); *Rosengarten v. Buckley,* 613 F.Supp. 1493, 1499 (D.Md.1985); *Grossman v. Johnson,* 89 F.R.D. 656, 663 (D.Mass. 1981), *aff'd,* 674 F.2d 115 (1st Cir.1982). The authority of the Fund's Board to appoint the SLC to review Strougo's claims and to determine what action the Fund should take was recognized in the December 1, 1997 opinion and order. *See Strougo,* 986 F.Supp. at 814.

■ The Court has previously determined that the standard articulated in *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.1981) (hereinafter *"Zapata"*) will apply in this case. *See Strougo,* 1 F.Supp.2d at 280–82. In *Zapata,* the Supreme Court of Delaware articulated a two-step standard of review applicable to motions to terminate derivative actions based on the recommendation of a special litigation committee:

> First, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions ... The corporation should have the burden of proving independence, good faith and a reasonable investigation, rather than presuming independence, good faith and reasonableness.

430 A.2d at 788. Once the reviewing court is satisfied that the committee has met its burden of proving good faith and reasonableness, the court, in its discretion, may proceed

---

2. Under ICA § 48(a), control person claims are predicated upon liability under other applicable sections of the ICA. *See* ICA § 48(a). Accordingly, Strougo's § 48(a) claim is dependent upon the validity of his ICA § 36(a) claim.

to the second prong. That prong requires the court to "determine, applying its own business judgment, whether the motion should be granted." *Id.*, at 788–89. *See also Abramowitz v. Posner*, 672 F.2d 1025 (2d Cir.1982); *Joy v. North*, 692 F.2d 880 (2d Cir.1982) (applying Connecticut law). The "function of the court's review is to determine the balance of probabilities as to likely future benefit to the corporation, not to render a decision on the merits, fashion the appropriate legal principles or resolve issues of credibility. Where the legal rule is unclear and the likely evidence in conflict, the court need only weigh the uncertainties, not resolve them. The court's function is thus not unlike a lawyer's determining what the case is 'worth' for purposes of settlement." *Joy v. North*, 692 F.2d at 892.

Pursuant to the language of *Zapata* a motion to terminate a derivative suit is neither a motion to dismiss under Rule 12(b), nor is it a motion for summary judgment pursuant to Rule 56. This is because it is not addressed to the adequacy of the cause of action alleged in the complaint, on the one hand, nor on the other, is it addressed to the merits of the issues joined by the pleadings. Rather, the motion is a "hybrid" one, derived by analogy to a motion to dismiss a derivative suit based upon a voluntary settlement reached between the parties and to a motion brought pursuant to Rule 41(a)(2) whereby a plaintiff unilaterally seeks a voluntary dismissal of the complaint subsequent to the filing of an answer by the defendant. As such it is addressed necessarily to the reasonableness of dismissing the complaint prior to trial without any concession of liability on the part of the defendants and without adjudicating the merits of the cause of action itself. *Zapata*, 430 A.2d at 787–88; *Kaplan v. Wyatt*, 484 A.2d 501, 505–07 (Del.Ch.1984), *aff'd* 499 A.2d 1184 (Del.1985). Although the motion is not strictly one for summary judgment, the corporation moving for termination bears the burden of proving the independence, good faith, and reasonableness of the SLC's review by evidence sufficient to eliminate any genuine questions of fact with regard to these issues. *Kaplan*, 484 A.2d at 507.

### 1. *The SLC Acted Independently*

"Whether or not a special litigation committee's decision to terminate a derivative litigation is independent or not depends on the totality of the circumstances." *In re Oracle Sec. Litig.*, 852 F.Supp. 1437, 1441 (N.D.Cal.1994) (Delaware law). The "totality of the circumstances" test does not "necessitate the complete absence of any facts which might point to non-objectivity." *Id.* at 1442. A director is independent when he is in a position to base [his] decision on the merits of the issue rather than ... extraneous considerations or influences. *Johnson v. Hui*, 811 F.Supp. 479, 486 (quoting *Kaplan*, 499 A.2d at 1189).

Strougo asserts that the SLC has not met its burden of establishing independence. As an initial matter, Strougo contends that special litigation committees are inherently biased. He notes that several courts have taken notice of the workings of structural bias of special committees. *See e.g., Joy*, 692 F.2d 880; *Hasan v. Clevetrust Realty Investors*, 729 F.2d 372, 377 (6th Cir.1984); *see also Zapata*, 430 A.2d at 787 (describing "a 'there but for the grace of God go I' empathy"). Strougo maintains that "[i]t is difficult to understand how continued resort to special litigation committees ... will not have a pernicious effect on our system of justice." (Plaintiff's Memorandum at 3).

Structural bias in special litigation committees has been widely discussed and analyzed, and courts have "almost universally determined" that the standards of review developed for derivative suits are designed to overcome the effects, if any, of structural bias. *Weiland v. Illinois Power Company*, 1990 WL 267364 at *15 (September 17, 1990 C.D.Ill.); *Zapata*, 430 A.2d 779; *Auerbach v. Bennett*, 47 N.Y.2d 619, 393 N.E.2d 994, 419 N.Y.S.2d 920 (N.Y.1979); *Lewis v. Graves*, 701 F.2d 245 (2d Cir.1983). Indeed, only a minority of courts have found structural bias sufficient to taint the independence of litigation committee members. *See Peller v. The Southern Company*, 707 F.Supp. 525, 527 (N.D.Ga.1988) (criticizing the view espoused in *Hasan*, 729 F.2d at 377, that structural bias is sufficient to taint the independence of special litigation committee members), *aff'd*

911 F.2d 1532 (11th Cir.1990). The majority view recognizes that independent directors are capable of rendering an unbiased opinion even though they were appointed by the defendant directors and share a common experience with the defendants. *Id.* at 525. As the court noted in *Peller,* if independent litigation committees are to be utilized, courts must accept the likelihood that its members will have experience similar to that of the defendant directors. *Id.* Thus, structural bias should not destroy the independence of an independent litigation committee, but instead should be considered in reviewing the actions and decisions of the special litigation committee.

Adopting Strougo's reasoning would lead to the rejection of special litigation committees in their entirety. *See Miller v. Register and Tribune Syndicate, Inc.,* 336 N.W.2d 709, 716 (Iowa 1983) (rejecting the use of a special litigation committee). While mindful of the admonitions of the Honorable Ralph K. Winter in *Joy,* that "if the ... directors expected any result other than a recommendation of termination ... they would probably never establish a committee," 692 F.2d at 888, the Court rejects the blanket condemnation of special litigation committees in favor of tangible evidence demonstrating a lack of independence.

### a. *Da Costa*

▮ Strougo advances four reasons in support of his claim that Da Costa is not independent. First, Strougo contends that Da Costa "cannot be deemed a suitable person to independently inquire into the merits of the action as part of the SLC process" because he "was initially named [as] a defendant and moved to dismiss." (Plaintiff's Memorandum at 5–6). Strougo asserts that the earlier motion by the Independent Directors to dismiss plaintiff's complaint taints Da Costa because "he contended, gratuitously, that plaintiff's allegations had no merit." (Plaintiff's Memorandum at 6). Strougo cites a portion of the Independent Directors' July 26, 1996 Memorandum of Law in Support of their Motion to Dismiss as evidence of "overt prejudgment."

In dismissing the Section 36(a) claim against him, the Court specifically held that there is no basis for inferring that Da Costa "would not act in the Fund's best interest." *Strougo,* 964 F.Supp. at 800. Moreover, since a "motion to dismiss is designed to test the legal sufficiency of the complaint ... [and not] the evidence at issue," *see e.g., De Jesus v. Sears Roebuck & Co., Inc.,* 87 F.3d 65, 69 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996), it cannot be concluded that Da Costa prejudged the evidence in this case. *See also Triad Assocs., Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989) ("the purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits").

▮ Second, Strougo contends that Da Costa lacks independence because he took part in the approval of the Rights Offering in question. The law is clear that the "mere fact that a director was on the Board at the time of the acts alleged in the complaint does not make that director interested or dependent so as to infringe on his independent business judgment of whether to proceed with the litigation." *Kaplan,* 499 A.2d at 1189. "Even a director's approval of the transaction in question does not establish lack of independence." *Id. See also Cuker v. Mikalauskas,* No. 3470 (Common Pleas Ct. Philadelphia Co. Feb. 26, 1998) (Pennsylvania law) (rejecting argument that "the members of the SLC were incapable of objective judgment since they were participating members of the PECO Board and two of the three served on the Board's Audit Committee at the time of the allegedly wrongful actions set forth in Plaintiffs' Complaint").

Third, Strougo maintains that Da Costa's allegiance is to Brazil and not to the Fund's shareholders. Citing from Da Costa's deposition transcript, Strougo asserts that "in a rare, unguarded moment," Da Costa revealed why he serves as a Fund director. (Plaintiff's Memorandum at 7). Strougo quotes Da Costa as saying, "I do it because I think I'm doing an important job for my country." Thus, Strougo concludes, Da Costa's patriotism conflicts with his role as an independent director.

The Fund asserts that the sentence quoted by Strougo is out of context and that a full recital of the question and answer set forth below illustrates Da Costa's independence:

Q. Do you think that maybe Scudder was just asking you to rubber stamp a decision?

A. I'm in the stage of my life where I don't need to rubber stamp anything. I don't need to rubber stamp anything. I'm an independent. Brazil Fund is an interesting experience for me. I don't have any necessity to please Scudder in any circumstance whatsoever. The amount of fees I do receive from them, I don't work for Scudder, they don't represent any importance whatsoever for my income. I do it because I think I'm doing an important job for my country and serving and learning part of the experience in 40 years in the Brazilian capital markets.

*See* Da Costa Tr. at 46–47.

Throughout his deposition, Da Costa repeatedly emphasized that as a member of the Fund's Board and as a member of the SLC, he has acted solely on behalf of the Fund and its shareholders. *See e.g.,* Da Costa Tr. at 15 ("Our routine work as independent director is to oversee the quality of management and if Scudder is doing proper work for the benefit of the shareholders of the fund.").

Finally, Strougo suggests that Da Costa lacks independence because (i) defendant Villani described Da Costa collectively with several other individuals as "good friends" and (i) Da Costa asked Villani if he "would mind talking to his son who recently graduated from Yale with a masters in International Relations." (Plaintiff's Memorandum at 8).

Da Costa avers that his son does not, and never has, worked for Scudder. *See* Da Cos-

ta Reply Declaration, August 22, 1998, at ¶ 2. Da Costa also testified during his deposition that his friends do not include any "of the independent or dependent directors of Scudder," including Villani. Da Costa Tr. at 23.

In any business setting, associations and contacts of the type which Da Costa has had or may have had with some of the individual directors [and the Fund are neither inappropriate nor do they suggest that Da Costa would not faithfully discharge his obligations to the Fund's shareholders. *See In re Oracle Sec. Litig.,* 852 F.Supp. at 1442. Indeed, other cases have found a committee member to be independent even though the relationships were more extensive. In *Kaplan v. Wyatt,* 484 A.2d 501, a committee member who was a major shareholder and a director of companies which had business relationships with the corporation totaling many millions of dollars was found to be independent. In *Genzer v. Cunningham,* 498 F.Supp. 682 (E.D.Mich.1980), one of the committee members was a paid consultant to the company and found to be independent. *See also In re Tire & Rubber Co. Sec. Litigation,* 726 F.2d 1075, 1084 (6th Cir.1984). The Fund has satisfactorily demonstrated Da Costa's independence.[3]

### b. *Froewiss*

Strougo does not dispute that Froewiss (i) has no business, personal or family ties with any of the other directors of the Fund; (ii) had no involvement in any of the facts and circumstances surrounding the allegations of the Complaint; or (iii) is an experienced and well-qualified director. Strougo contends that Froewiss lacks independence for the sole reason that his name was recommended to Da Costa by the law firm of Debevoise & Plimpton ("D & P"), which represents the Fund. According to Strougo, "a prime example of the SLC's lack of candor

---

**3.** Even if Da Costa did lack some degree of independence, because Maryland law requires only one director to form a special litigation committee, *see* Md. Corp & Ass'ns. § 2–411, such a finding would not deprive the SLC as a whole of its independence. *See In re Oracle Sec. Litig.,* 852 F.Supp. at 1442 (holding that even if one SLC member had "some alleged interest," since he was not the only member of the SLC, there was "nothing to indicate that the SLC's judgment

was tainted in any way"); *Johnson,* 811 F.Supp. at 487 ("[E]ven if the evidence suggests that [one SLC director] is tainted to some degree, this taint does not rise to the level where the Court should conclude that the SLC is tainted. [The SLC director in question] is not the only member of the SLC, and there is no indication that the objectivity of [the other SLC member] or committee counsel were overborne by [his] arguments or conduct ...").

... is its attempt to conceal the background of Froewiss' appointment to the SLC." (Plaintiff's Memorandum ·at 7).

Both Froewiss and Da Costa have explained clearly how Froewiss was appointed. Froewiss has testified that shortly after he began teaching at New York University's Stern School of Business in 1996, he told an attorney at D & P (which does not represent Scudder), with whom he had a professional relationship, that he might be interested in joining a corporation's board of directors. *See* Froewiss Tr. at 8–9.

Da Costa avers that he had the names of several possible candidates to join him as a member of the Fund's Board and the SLC. Some of these candidates he knew personally. Other candidates were recommended by D & P; Ropes & Gray, counsel for the Fund's outside directors; or by members of the Fund's Board themselves. In making the final choice for the new director of the Fund, Da Costa maintains that who suggested each name had no significance. *See* Da Costa 1997 Decl. ¶ 4.

According to Da Costa, the criteria for selecting the new Board member were as follows. First, the candidate had to have sufficient stature and respectability so that his or her decisions would be "above reproach." Second, the candidate had to be completely independent of Scudder. Finally, the candidate had to have time availability, preferably a residence in New York City, and the "willingness to share with Da Costa the responsibility of fully investigating plaintiff's claims." Da Costa 1997 Decl. ¶ 5. Of the original group of names, Da Costa ultimately selected Froewiss. The Fund emphasizes that Froewiss was selected by Da Costa, and not by Scudder or the individual defendants.

The fact that Froewiss was recommended by D & P, alone, does not demonstrate an interest or bias that would compromise Froewiss' objectivity.

Both of the members of the SLC are "disinterested" members of the SLC in the sense that they are in a position to base their decisions on the merits of the issues rather than on extraneous considerations or influences. The record shows that the SLC oper-

ated and deliberated independently of Scudder, the Scudder Directors and the Outside Directors. Contrary to Strougo's suggestion, the SLC's independence is not tainted by Froewiss' testimony that ST & B was one of several firms recommended to him and Da Costa by Ropes and Gray. Indeed, Da Costa testified that ST & B was selected as counsel to the SLC because it had no previous connection or relationship with Scudder or any of the individual defendants. Several courts have relied upon the appointment of independent counsel as a factor in reaching a finding of independence. *See e.g., In re Oracle Sec. Litig.,* 852 F.Supp. at 1442; *Abella v. Universal Leaf Tobacco Co., Inc.,* 546 F.Supp. 795, 800 (E.D.Va.1982).

### 2. *The SLC Conducted Its Investigation in Good Faith*

Strougo contends that the SLC's recommendation to terminate suit on his claims was not made in good faith. The Court's focus in this area is intertwined with its analysis of whether the SLC conducted a reasonable investigation. *See Stein v. Bailey,* 531 F.Supp. 684, 695 (S.D.N.Y.1982). " 'Proof ... that the investigation has been so restricted in scope, so shallow in execution, or so pro forma or halfhearted as to constitute a pretext or sham ... would raise questions of good faith....' " *Abramowitz v. Posner,* 513 F.Supp. 120, 132 (S.D.N.Y.1981) (quoting *Auerbach,* 47 N.Y.2d at 634–35, 393 N.E.2d at 1002, 419 N.Y.S.2d at 929).

Strougo asserts that the SLC's methodology was "woefully inadequate." (Plaintiff's Memorandum at 10). First, Strougo contends that some of the 30 boxes reviewed by the SLC (i) were not filled to capacity; (ii) contained documents that were also contained in other boxes; and (iii) concerned closed-end funds managed by Scudder other than the Brazil Fund. The Fund does not dispute these allegations, but maintains that Strougo cannot avoid dismissal with this argument. Indeed, these facts do not rise to the level of bad faith. Whether there were 20 boxes filled to capacity or 30, the SLC still conducted an extensive document review. *See* SLC's Report at 10 and Exh. 4.

Second, Strougo attacks the SLC for not conducting interviews under oath and for conducting two interviews by telephone. Strougo's objections are unavailing. In the majority of cases in which derivative actions have been terminated by special litigation committees, the interviews were not taken under oath or before a stenographer. *See e.g., Johnson,* 811 F.Supp. at 489 ("the absence of long transcribed interviews [under oath] does not undermine the undisputed facts which the SLC has managed to prove"); *Rosengarten,* 613 F.Supp. at 1503 (holding that the interview summaries by the committee's counsel "reflect a comprehensive inquiry into the issues before the Committee")

Third, Strougo complains that the SLC only interviewed "friendly witnesses." (Plaintiff's Memorandum at 10). The SLC interviewed each individual defendant, three representatives of Scudder and two representatives of Smith Barney, Inc., the investment banking firm retained for the Rights Offering. The SLC also re-interviewed certain witnesses. Potentially "unfriendly" witnesses, for example, plaintiff and his counsel, were invited to be interviewed and refused. Strougo does not identify a single witness that he feels the SLC should have but did not interview.

Fourth, Strougo contends that while the SLC's Report focuses on the good investment opportunities in Brazil at the time of the Rights Offering, which Strougo does not dispute, the Report "utterly ignores" the issue of the demand for the Fund's shares in the United States. (Plaintiff's Memorandum at 11). Strougo states that since "96% of the Fund's shareholders went to the trouble of opting out of" the Fund's dividend reinvestment plan, "there was little, if any, demand for more shares of the Fund." (Plaintiff's Memorandum at 11–12).

In fact, the SLC's Report is not "silent" on this issue. On August 13, 1997, the SLC asked John Hebble ("Hebble"), the head of Scudder's accounting and budget departments, why so many Fund shareholders opt out of the Fund's dividend reinvestment plan:

Hebble said that at some point the dividend reinvestment plan was amended to provide that all dividends are automatically reinvested unless a shareholder opts out. However, the majority of shares of the Brazil Fund are held in street name. Brokers who hold funds for clients generally opt out of the dividend reinvestment plan. This way, according to Hebble, brokers get commissions when there are capital distributions. If capital gains are reinvested, brokers do not receive commissions.

SLC Report, Exh. 14 at 2.

In addition, the SLC notes that there was heavy demand for more shares of the Fund. Indeed, ninety-two percent of the Fund's shareholders subscribed and sixty-one percent oversubscribed, resulting in 2.7 million oversubscribed shares. *See* SLC's Report at 42. Furthermore, while the SLC did consider the demand side, it is not unusual that the SLC would focus its investigation on plaintiff's allegations in his Complaint, namely that the justification of good investment opportunities in Brazil for the Rights Offering was "vague, illusory and/or speculative." Complaint ¶ 79.

Fifth, Strougo asserts that the SLC should have asked each of the three Independent Directors, defendants Edgar Fiedler, Ronaldo A. da Frota Nogueira and Wilson Nolen ("Nolen"), "how much of their annual income the fees they receive for serving on the Scudder boards comprises." (Plaintiff's Memorandum at 12). The Statement of Additional Information which accompanied the Prospectus for the Rights Offering, listed the total compensation received by the Independent Directors. *See* Kronenberg Aff., Exh. C. Thus, the compensation received from Scudder by the Independent Directors was a matter of public record.

Finally, Strougo criticizes the SLC for taking at "face value" the statement by defendant Nolen at his interview that he had opposed a rights offering for the Korea Fund since that fund had in fact conducted two rights offerings, one in 1995 and the other in 1997. However, the mere fact that Nolen had approved rights offerings for the Korea Fund does not necessarily imply, as Strougo suggests, that he was incapable of opposing the implementation of a rights offering when he thought it was not in the best interests of

fund shareholders.[4] Moreover, the fact that Da Costa was unaware that the Korea Fund had conducted two rights offerings is of marginal relevance. Ultimately, "even if the plaintiff were to point to one or two minor inconsistencies or inaccuracies it would not undermine the report as a whole." *Grafman v. Century Broadcasting Corp.*, 762 F.Supp. 215, 220 (N.D.Ill.1991).

As the court noted in *Kaplan v. Wyatt*, "the *Zapata* procedure encourages Plaintiffs to bring an all out attack against the details of the Special Committee's investigation." 484 A.2d at 517. Despite Strougo's contentions and as demonstrated by the SLC Report, the SLC pursued its investigation in a thorough and diligent manner. From July through November 1997, the SLC interviewed 11 witnesses and conducted a comprehensive review of documentary materials. The SLC requested documents from defendants throughout the course of its investigation and prepared memoranda of its interviews and minutes of its meetings. The SLC's Report and the three volumes of exhibits thereto outline the SLC's reconstruction of the history of the events surrounding plaintiff's allegations, and the SLC's findings and conclusions based on its efforts. This is a reasonable investigation and thus, the SLC has demonstrated its good faith.[5] *See Rosengarten*, 613 F.Supp. at 1501 (holding that special litigation committee acted in good faith based upon a 33–page report, several exhibits, interview summaries, meeting minutes and a chart of the movement and volume of the corporation's stock during the relevant time period); *Grossman*, 89 F.R.D. at 664 (holding that the special litigation committee's investigation, which spanned several months, was thorough based upon the documents it reviewed and the witnesses interviewed).

### 3. *The SLC Had Reasonable Bases for Its Conclusions*

▬ The SLC's reasoning in support of its conclusion that Strougo's derivative suit should be terminated is stated clearly in its Report and will not be reiterated in full detail here. Based on the SLC's findings, the SLC concluded that: (1) there is no basis in fact for the allegations set forth in the Strougo Complaint; (2) continuation of the lawsuit is not justified on the basis of any potential recovery from Scudder or the Fund's directors; and (3) pursuit of the Strougo litigation would be costly, distracting and would result in negative, unjustified publicity for the Fund. In reviewing the SLC's conclusions, the Court does not take an independent look at the merits of the lawsuit, but must find that the SLC's consideration of the merits of the claims was reasonable. *See Lewis v. Fuqua*, 502 A.2d 962 (Del.Ch.1985). In making this determination the *Zapata* rule forces the court to rely upon the record generated by the SLC. *See Rosengarten*, 613 F.Supp. at 1502. Having reviewed the Report, there is ample support for the SLC's findings of fact and conclusion that Scudder and the Fund's directors did not breach their respective fiduciary duties of loyalty and care by the development and implementation of the Rights Offering.

Strougo maintains that since the Fund's board did nothing other than "rubber-stamp" Scudder's desire to have a rights offering, the Report's conclusions are "utterly predictable and utterly unreasonable." (Plaintiff's Memorandum at 15). Specifically, Strougo alleges that Scudder abruptly announced the Rights Offering to the Fund's Board in October of 1995. As documented in board minutes and by the interviews conducted by the SLC, the Fund had been periodically discussing the possibility of a rights offering and meeting with investment bankers since 1991. *See* SLC's Report at 16–20, 35–36.

Strougo next points to Scudder's meeting calendars for 1994 and 1995, which list the dates and times for board meetings of various funds managed by Scudder, as proof, due

---

4. The documentary evidence shows that at least two other proposed rights offerings by funds managed by Scudder on which Nolen served as a board member were canceled and/or deferred prior to his September 18, 1997 interview. Kronenberg Aff., Exh. D.

5. Another indicia of good faith and reasonableness of the investigation is the use of capable counsel. *See Kaplan,* 499 A.2d at 1191.

to the fact that some meetings are "scheduled to last only one-half hour," that the independent directors are "more concerned with remuneration and lunch than with protecting the interests of public investors." (Plaintiff's Memorandum at 16 n. 7). However, the October 5, 1995 Special Board Meeting pursuant to which the Fund approved the Rights Offering was not a pre-scheduled Board meeting. Moreover, the minutes of the October 5, 1995 Special Board Meeting describe a lengthy and detailed discussion regarding whether a rights offering is desirable for the Fund's shareholders. *See* SLC's Report, Exh. 38.

Strougo contends that the Board's consideration was limited to a discussion of the various structural alternatives of a rights offering, instead of whether the Fund should issue rights in the first instance. However, the October 5, 1995 minutes show that the Fund's Board specifically discussed the advantages and disadvantages of raising additional capital in the form of a rights offering, a discussion that the Board members had been having since 1991. *See* SLC's Report, Exh. 38; SLC's Report at 35. The Fund's Board members were sophisticated and knowledgeable professionals who were fully informed as to the pros and cons of a rights offering.[6] *See* SLC's Report at 35–36. Moreover, the Rights Offering was structured to benefit all of the Fund's shareholders. Shareholders were able to realize fair consideration if they chose not to participate in the Rights Offering by selling their rights on an exchange for their intrinsic value.

Finally, Strougo questions how the Report can describe Smith Barney's role as providing "independent financial advice" since it stood to receive substantial underwriting fees. Da Costa responded to this question at his deposition as follows:

> Smith Barney is considered, through Mr. Michael Porter, to have one of the best capabilities in terms of analyzing performance of mutual funds, close end funds, that's why we choose to ask his opinion ... I don't reconcile the idea that by being

remunerated you lose your capability of being independent. That's my thought.

Da Costa Tr. at 81–82.

### B. *The Determination of the SLC Reflects Sound Business Judgment*

■ As the Court noted in its April 6, 1998 Opinion, "the [SLC's] Report must satisfy the business judgment of the Court." *Strougo*, 1 F.Supp.2d at 281. In its discretion, the Court can undertake its own independent review of the merits of the derivative claim before approving the SLC's recommendation of dismissal. *Zapata*, 430 A.2d at 789. This discretionary second step is designed to prevent situations where a special litigation committee complied with all the technical requirements of *Zapata*, but the outcome violates the spirit of that procedure, or where a corporation's action would prematurely terminate a stockholder's grievance deserving further consideration in the corporation's interest. *Id.* The second step can be an "imprecise smell test" allowing the court to "search between the lines of the SLC's report for the scent of a meritorious claim enclosed within a record that has not been opened by truly adversarial proceedings." *Johnson*, 811 F.Supp. at 490. The Court must determine, through the exercise of its independent business judgment, whether the facts and legal authorities placed before it establish that continuing the derivative litigation will benefit the corporation on whose behalf the derivative claim is presented. *See id.* "Judicial scrutiny of special litigation committee recommendations should ... be limited to a comparison of the direct costs imposed upon the corporation with the potential benefits." *See Joy*, 692 F.2d at 892

In the Court's view, Strougo's core liability theory—that Scudder and the Fund's directors breached their respective fiduciary duties of loyalty and care by the development and implementation of the Rights Offering—

---

6. For example, Outside Director Fiedler served as Assistant Secretary of the Treasury during the Nixon and Ford administrations. From 1975 to 1996, Fiedler was a vice president and economic counselor with the Conference Board, a private business research group.

is unlikely to prevail.[7] The existence of available and realistically discoverable evidentiary support for the propositions that the interests of Scudder took precedence over the interests of the Fund and its shareholders and/or that defendants failed to act "advisedly with due care, as well as in good faith." *King v. Douglass*, 973 F.Supp. 707 (S.D.Tex.1996), lacks the persuasive force necessary for Strougo to prevail.

Moreover, Strougo has not articulated a supportable theory of how the Fund as an entity was damaged.[8] Strougo contends that by approving the Rights Offering, the "defendants caused the Fund to sell $1.00 worth of assets for only 70 cents." (Plaintiff's memorandum at 21). He avers that the dilution damage to the Fund is $1.88 (which the Prospectus disclosed would be the NAV dilution per share post-Rights offering) multiplied by 16,226,496 (the 12,166,496 shares outstanding pre-Rights Offering plus the 4,060,000 new shares issued in the Rights Offering), which equals approximately $30,-500,000.

As an initial matter, the Fund contends that the 4,060,000 new shares that were issued in the Rights Offering could not have been and were not diluted. Thus, Strougo should have multiplied the $1.88 (the NAV dilution per share post-Rights Offering) by 12,166,496 (the shares outstanding pre-Rights Offering) in order to calculate the total NAV dilution, which equals approximately $23,000,000.

Regardless of which calculation is used, however, the Fund asserts that such short-term NAV dilution is mathematically inherent in any rights offering. As described in the SLC's Report, shares of closed-end funds trade on the open market at a premium or discount to their net asset value ("NAV"), which equals the find's total net assets divided by the number of shares. Rights offerings are inherently NAV-dilutive in the short-term because new shares are added to the fund at a price below NAV. Thus, in a rights offering, "one would expect a near-term drop in the market price of the stock." SLC's Report at 13, 30, 43.

The Fund's October 5, 1995 Special Board Meeting minutes state that the Fund's Directors decided that "the expected benefits to existing shareholders outweighed the potential dilution to shareholders." SLC's Report, Exh. 38. In order to pursue investment opportunities without raising new capital, the Fund would have had to sell current holdings. As set forth in the SLC's Report, due to the large amount of unrealized appreciation in the Fund's portfolio, this would have resulted in (i) a substantial decrease in the Fund's total net assets, thus frustrating the goal of taking advantage of investment opportunities; and (ii) taxes for shareholders. *See* SLC's Report at 27, 44. Accordingly, defendants maintain that the Fund's NAV may have declined by an even greater amount if the Fund had not implemented the Rights Offering.

While there was a near-term drop in the market price of the Fund's stock, the price rebounded within six weeks of the Rights Offering to the same price that the Fund's shares traded at before the Rights Offering was announced. *See* SLC's Report at 41–46. Similarly, the Fund's NAV rebounded within four months. *See* Kronenberg Aff., Exh. E. Thus, defendants contend that since the Fund's NAV "quickly" returned to the same level it was at before the Rights Offering, there is no conceivable damage to the Fund. On the contrary, as a result of the Rights Offering, the Fund's shareholders owned the same shares they held before the Rights Offering, at the same market price and NAV per share, but they were also able to purchase new shares at a substantial discount or sell their rights for their intrinsic value. SLC's Report at 44–45.

Strougo has not provided any evidence to refute the Fund's contention that the Rights

---

**7.** If plaintiff's claims of primary liability are legally insufficient under ICA § 36(a), then plaintiff's ICA § 48(a) must also be dismissed for want of a predicate violation. *See Omni Financial Corp. v. Cohen*, 1994 WL 97125 at *10 (March 22, 1994, S.D.N.Y.).

**8.** It is undisputed that since only shareholder derivative claims remain in this action, the issue is to what extent the Fund as an entity (as opposed to individual shareholders) has been damaged by the Rights Offering.

Offering was a sound and profitable transaction, nor has he sufficiently established injury to the Fund. Thus, even in the unlikely event that Strougo was to prevail on liability, it is unclear what, if anything, the corporation would recover.

On the other side of the balance, the SLC has determined that pursuit of the *Strougo* litigation would be costly, distracting and would result in unjustified publicity. *See* SLC's Report at 57. Strougo asserts that the Second Circuit in *Joy,* expressly rejected consideration of indirect costs such as the potential negative impact on the company's public image. In fact, the *Joy* Court specifically held that "where the likely net return to the corporation is not substantial in relation to shareholder equity," as here, a special litigation committee may consider "the lost profits which may result from [ ] publicity." 692 F.2d at 892. *See also Kaplan,* 484 A.2d at 509 (holding that special litigation committees may consider, in addition to matters of law and public policy, "such ethical, commercial, promotional, public relations, employee relations and fiscal factors as may be involved in a given situation").

Having exercised the second-step review, there is no basis on the grounds of business judgment to permit this action to go forward. The findings and conclusions of the SLC have been made independently, reasonably and in good faith thus satisfying the spirit of the Zapata standard. Further, this stockholder grievance does not deserve further consideration in the corporation's interest.

### Conclusion

For the reasons set forth above, the SLC satisfies the *Zapata* standard and the Fund's motion to dismiss is granted. Accordingly, Strougo's motion to remove confidentiality is denied as moot.

It is so ordered.